[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 3, 2010
JOHN LEY
CLERK

_____

No. 09-13092

_____

D. C. Docket No. 08-00310-CV-ORL-31-KRS

RALPH J. PENLEY,
DONNA PENLEY,
as Co-Personal Representatives of the Estate of
Christopher David Penley, Deceased; and as natural
parents of Christopher David Penley,

Plaintiffs-Appellants,

versus

DONALD F. ESLINGER,
as Sheriff of Seminole County,
MICHAEL W. WEIPPERT,
individually,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 3, 2010)

Before DUBINA, Chief Judge, MARTIN and COX, Circuit Judges.

MARTIN, Circuit Judge:

Christopher David Penley, a fifteen-year-old boy, modified a plastic air pistol to look like a real weapon and brought it to school. School officials called the police and, during the ensuing standoff, Lieutenant Michael W. Weippert fired a single shot, striking Mr. Penley in the head. The wound proved fatal. Ralph J. Penley and Donna Penley, acting as personal representatives of their son's estate, filed suit, seeking relief under both federal and state law. They alleged that under the circumstances lethal force was unnecessary and excessive, and, therefore, that Lieutenant Weippert had deprived their son of his Fourth Amendment rights. The district court disagreed, finding Lieutenant Weippert's decision reasonable and granting Lieutenant Weippert and his co-defendant, Sheriff Donald F. Eslinger, summary judgment.

The loss of such a young life is an undeniable tragedy. However, with their suit, the Penleys ask us to conduct precisely the sort of 20/20 hindsight inquiry against which the Supreme Court and this Court have repeatedly cautioned. We therefore affirm the district court's grant of summary judgment.

# I.

On January 13, 2006, Mr. Penley, a fifteen-year-old student at Milwee Middle School, brought a pistol to campus. Eventually his teacher learned that he was armed, and, as students fled from the classroom, Mr. Penley briefly held hostage at least one classmate. By the time police officers arrived, that student had escaped and Mr. Penley had left the classroom, making his way through campus.

When an officer of the Seminole County Sheriff's Office confronted Mr. Penley, commanding that he drop his weapon, the boy held the gun under his own chin, responded that he was going to die one way or another, and "slithered" into a bathroom. The bathroom had only one entrance, an overhead, roll up style door which remained open throughout the standoff that followed.

As police began to arrive on the scene, Sheriff's Deputy Christopher Maiorano, took up a position approximately sixty-five feet from the entrance to the bathroom. He attempted to communicate with Mr. Penley, but was only able to elicit the boy's name. Mr. Penley walked back and forth from one side of the bathroom to the other, pointing his weapon alternately in Deputy Maiorano's direction and at his own chin. In an effort to get Mr. Penley to drop his weapon, Deputy Maiorano holstered his own and showed Mr. Penley his hands. Instead of dropping the weapon, Mr. Penley pointed his gun directly at the officer. In his

deposition, Deputy Maiorano testified: "When he did that, I hugged the wall. I didn't want to get shot. [I] [g]rabbed back for my weapon. At that point I never put my weapon back in the holster." In a sworn statement, Deputy Maiorano also acknowledged that "when [Mr. Penley] drew down on me . . . I was scared, noticeably scared." Operating under the belief that the weapon was real, Deputy Maiorano announced "to everyone on scene" that Mr. Penley was wielding a large semiautomatic pistol.

Meanwhile, Sergeant Kevin Brubaker, a trained hostage negotiator, took up a position in front of the bathroom door. Sergeant Brubaker was still negotiating with the boy when Lieutenant Weippert fired the fatal shot. But, because Sergeant Brubaker had slid into a safer position, he was unable to see Mr. Penley at the moment the fatal shot was fired. Over the course of the negotiation, Mr. Penley had only once responded to Sergeant Brubaker's questions—revealing his name and age—and had refused to comply with the sergeant's repeated requests that he put down the gun. Sergeant Brubaker testified that not once during the negotiation did Mr. Penley point his weapon at the sergeant, nor did the sergeant feel threatened by the boy.

Lieutenant Weippert, a member of the SWAT team since 1989 and firearm use and defensive tactics instructor at Seminole Community College, was called to

4

the scene. Shortly after arriving, he moved to assist Deputy Maiorano. Armed with a scoped semiautomatic rifle, Lieutenant Weippert observed Mr. Penley as the boy moved across the frame of the open bathroom door three times. Each time, Mr. Penley aimed his gun at Lieutenant Weippert and Deputy Maiorano.

On Mr. Penley's third pass, Lieutenant Weippert "began to conclude" that the boy posed a danger to the lieutenant himself, "to others and to the children that were exposed to that open area." At approximately 10:20 a.m., Mr. Penley began to make another lateral pass across the threshold of the open door, pointing his gun at Lieutenant Weippert and Deputy Maiorano. Serving as spotter, Deputy Maiorano gave a signal and Lieutenant Weippert fired a single shot, striking Mr. Penley in the head. It was not until after the shot was fired that police entered the bathroom and discovered that the gun was not real. Mr. Penley died two days later.

According to Lieutenant Weippert, during the incident, he was concerned not only with assisting Deputy Maiorano, who was under the lieutenant's protection, but also with assuring the safety of the children whom he believed occupied the surrounding classrooms. For instance, the bathroom was adjacent to a portable classroom. This classroom, though occupied by children for at least a portion of the standoff, was at some point evacuated. However, as Lieutenant Weippert made his way to Deputy Maiorano, he was under the impression that

5

there were children in the room and believed that they had been instructed to stay in that room. Once he was situated beside Deputy Maiorano, his concern turned to children in rooms with exposed windows. The presence of children in at least some of the surrounding buildings is corroborated by the sworn statement of Sergeant Thomas Johnson of the Seminole County Sheriff's Office. Sergeant Johnson, who was positioned above the bathroom during the standoff, saw children moving about behind the windows of several classrooms located to the rear of the officers. He saw these students lifting up the window blinds and peering out. Sergeant Johnson also observed the silhouette of a person behind the glass doors of another classroom.

Following the death of their son, the Penleys filed a Complaint in the Circuit Court of Seminole County, Florida, which Defendants Sheriff Eslinger and Lieutenant Weippert removed to the U.S. District Court for the Middle District of Florida. With their Amended Complaint, the Penleys sought relief pursuant to 42 U.S.C. § 1983 and the Florida Wrongful Death Act, Fla. Stat. §§ 768.16–.26. They allege that Lieutenant Weippert used excessive force when he shot Mr. Penley, depriving the boy of his Fourth Amendment rights. Meanwhile, they claim that Sheriff Eslinger, and through him Seminole County, caused Mr. Penley's Fourth Amendment deprivation by promulgating a use of force policy that allowed

6

officers to use deadly force without giving a warning. Furthermore, they argue that Sheriff Eslinger, as Lieutenant Weippert's employer, should be found liable under Florida law for his employee's tortious conduct.

Sheriff Eslinger and Lieutenant Weippert filed separate motions for summary judgment. The district court granted both, holding that Lieutenant Weippert had not violated the Fourth Amendment and was not liable under state law. The Penleys appeal, insisting that genuine issues of material fact preclude resolution of their claims at this stage.

## II.

We review *de novo* a district court's grant of summary judgment and apply the same legal standards that governed the district court's analysis. Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1194 (11th Cir. 2010).

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). In determining the relevant set of facts at the summary judgment stage, we must view all evidence and make any "reasonable inferences that might be drawn therefrom in the light most favorable to the non-moving party." Rine v. Imagitas, Inc., 590 F.3d 1215, 1222 (11th Cir. 2009).

7

However, we draw these inferences only "to the extent supportable by the record." Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8 (2007) (emphasis omitted).  Thus, the requirement to view the facts in the nonmoving party's favor extends to genuine disputes over material facts and not where all that exists is "some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In other words, once a moving party has carried its burden under Rule 56(c), "the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment."  Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009).  A dispute over a fact will only preclude summary judgment if the dispute "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A court must deny summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

In the context of qualified immunity analysis, the Supreme Court has cautioned that if a court were "to deny summary judgment any time a material issue of fact remains on the excessive force claim," it might "undermine the goal of qualified immunity to 'avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.'"  Saucier v. Katz,

8

533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)), abrogated in part by Pearson v. Callahan, 555 U.S. ----, 129 S. Ct. 808, 818 (2009). With this in mind, we have explained:

> When a district court considers the record in [the light most favorable to the party asserting the injury], it eliminates all issues of fact. By approaching the record in this way, the court has the plaintiff's best case before it. With the plaintiff's best case in hand, the court is able to move to the question of whether the defendant committed the constitutional violation alleged in the complaint without having to assess any facts in dispute. Thus, because material issues of disputed fact are not a factor in the court's analysis of qualified immunity and cannot foreclose the grant or denial of summary judgment based on qualified immunity; we decline to entertain [a plaintiff's] arguments concerning the allegedly disputed facts.

Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005). In other words, "[a]t the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, the reasonableness of [the officer's] actions . . . is a pure question of law." Scott, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8 (citation omitted).

**III.**

The Penleys argue that Lieutenant Weippert used excessive force when he shot Mr. Penley, depriving the boy of a clearly established constitutional right. Therefore, they contend that they are entitled relief under 42 U.S.C. § 1983. They also argue that Sheriff Eslinger is liable under § 1983 for implementing and maintaining a use of force policy that did not require Lieutenant Weippert to warn Mr. Penley before firing, as they believe Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694 (1985), mandates. They then argue that Lieutenant Weippert violated state law and, because he acted in bad faith and for a malicious purpose, any state privilege is negated. Finally, they maintain that under Florida law Sheriff Eslinger is liable as Lieutenant Weippert's employer.

A.

In civil rights actions brought under § 1983, the doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow, 457 U.S. at 818, 102 S. Ct. at 2738). This Court adopts a multi-step, burden shifting qualified immunity analysis:

In order to receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. . . . Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.

Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations and internal quotation marks omitted). In evaluating whether a plaintiff has met his burden, "[t]he threshold inquiry . . . is whether [the] plaintiff's allegations, if true, establish a constitutional violation." Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier, 533 U.S. at 201, 121 S. Ct. at 2156 ).[1]

The Penleys claim that, when he shot their son, Lieutenant Weippert used excessive force, in violation of Mr. Penley's Fourth Amendment right to be free from unreasonable seizure. See Lee, 284 F.3d at 1197. But, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871–72 (1989). However, the level of force applied must not exceed that which a "'reasonable officer would believe . . . is necessary in the situation at hand.'"

---

[1] We recognize that we are no longer required to analyze whether Lieutenant Weippert deprived Mr. Penley of his constitutionally protected rights before asking if those rights were clearly established. See Pearson, 129 S. Ct. at 818. However, in this case we will follow the traditional approach.

11

Mercado v. City of Orlando, 407 F.3d 1152, 1156–57 (11th Cir. 2005) (quoting Lee, 284 F.3d at 1197).

The Fourth Amendment's "objective reasonableness" standard supplies the test to determine whether the use of force was excessive. Crenshaw v. Lister, 556 F.3d 1283, 1290 (11th Cir. 2009). Accordingly, courts must "careful[ly] balanc[e] . . . the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396, 109 S. Ct. at 1871 (internal quotation marks omitted). This Court has distilled from Supreme Court jurisprudence several factors to aid our effort to "slosh . . . through the factbound morass of [this] 'reasonableness'" analysis. Scott, 550 U.S. at 383, 127 S. Ct. at 1778. We highlight three factors set out by Graham v. Connor:

> The analysis requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [the suspect] . . . actively resist[ed] arrest or attempt[ed] to evade arrest by flight.

Crenshaw, 556 F.3d at 1290 (citation and internal quotation marks omitted). A mechanical application of these factors, however, is not appropriate. See Scott, 550 U.S. at 383, 127 S. Ct. at 1777–78. Instead, we must be careful to evaluate the reasonableness of an officer's conduct "on a case-by-case basis 'from the

12

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1872), modified, 14 F.3d 583 (11th Cir. 1994). Further, the Supreme Court has cautioned that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396–97, 109 S. Ct. at 1872.

Use of deadly force indisputably implicates weighty individual interests. See Garner, 471 U.S. at 9, 105 S. Ct. at 1700. For over twenty years, Tennessee v. Garner has guided courts' Fourth Amendment reasonableness analysis where officers used lethal force. However, the Supreme Court has explicitly cautioned against an interpretation of Garner as "a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" Scott, 550 U.S. at 382, 127 S. Ct. at 1777. Instead, "Garner was simply an application of the Fourth Amendment's 'reasonableness' test to the use of a particular type of force in a particular situation.'" Id. (citation omitted). Accordingly, as set out in Garner, the use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect

13

committed a crime involving the infliction or threatened infliction of serious harm, such that his being at large represents an inherent risk to the general public; and the officers either issued a warning or could not feasibly have done so before using deadly force. See 471 U.S. at 11–12, 105 S. Ct. at 1701. But, once again, none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect. Scott, 550 U.S. at 382, 127 S. Ct. at 1777.

To satisfy the objective reasonableness standard imposed by the Fourth Amendment, Lieutenant Weippert must establish that the countervailing government interest was great. See Crenshaw, 556 F.3d at 1290. As noted above, analysis of this balancing test is governed by (1) the severity of the crime at issue; (2) whether Mr. Penley posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest. See id. In this case, the reasonableness analysis turns on the second of these factors: presence of an imminent threat.

Both the first and third factors weigh in Lieutenant Weippert's favor. Bringing a firearm to school, threatening the lives of others, and refusing to comply with officers' commands to drop the weapon are undoubtedly serious crimes. As the Penleys themselves concede, they "have never taken the position that because the gun turned out to be a toy, the situation was any less serious." The third factor favors a finding of reasonableness as well. While the Penleys argue

14

that Mr. Penley did not attempt to run from the bathroom, they do not contest that their son refused to comply with repeated commands to drop his weapon. Non-compliance of this sort supports the conclusion that use of deadly force was reasonable. See Garczynski, 573 F.3d at 1168–69 (concluding that refusal to comply with repeated commands to show one's hands, to drop a cell phone, and then to drop the weapon pointed at the suspect's own head together justified officers' "escalation into deadly force").

Though a closer call, the second factor also supports Lieutenant Weippert's argument that he acted reasonably. The government has a weighty interest in protecting members of the public and police officers from the threat of force. See id. at 1166. Thus, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others," use of deadly force does not violate the Constitution. Garner, 471 U.S. at 11, 105 S. Ct. at 1701 (noting that this is the case even where an officer uses deadly force merely to prevent the suspect's escape); see also Carr v. Tatangelo, 338 F.3d 1259, 1268 (11th Cir. 2003). As this Court has clarified, the second factor can be reduced to a single question: "whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely dangerous." Pace v. Capobianco, 283 F.3d 1275, 1281 (11th Cir. 2002).

15

Mr. Penley demonstrated his dangerous proclivities by bringing to school what reasonable officers would believe was a real gun. He refused to drop the weapon when repeatedly commanded to do so. Most importantly, he pointed his weapon several times at Lieutenant Weippert and Deputy Maiorano. We have held that a suspect posed a grave danger under less perilous circumstances than those confronted by Lieutenant Weippert. See, e.g., Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007); Pace, 283 F.3d at 1281.[2]

---

[2] In Pace v. Capobianco, 283 F.3d 1275 (11th Cir. 2002), we found no violation of the Fourth Amendment when a high speed chase that followed a traffic violation ended with four police vehicles cornering the suspect's car in a cul-de-sac. Id. at 1277. The suspect had stopped his car, which faced the curb, and was still in the vehicle. Id. The officers shouted to get out of the car, then, "[w]ithin a moment of [the suspect's] car stopping (at most, a very few seconds), [one deputy]—from a position in front of [the suspect's] car—fired two shots . . . through the front windshield." Id. at 1278. This Court found that because the suspect drove recklessly, never left his automobile, and never turned off its engine, reasonable police officers would have "probable cause to believe that [the car] had become a deadly weapon with which [the suspect] was armed." Id. at 1282. So, despite the fact that the suspect "did not try to run over the deputies and that [the suspect], in the cul-de-sac, did not aim the car at the deputies," id., we concluded that the suspect "would have appeared to reasonable police officers to have been gravely dangerous," id. at 1281. This Court decided that use of deadly force was, therefore, constitutionally permissible.

Mr. Penley's case is factually analogous to Garczynski v. Bradshaw, 573 F.3d 1158 (11th Cir. 2009), in which we found no violation of the Fourth Amendment where officers employed lethal force to seize a suicidal suspect who repeatedly refused to drop his gun and swung the weapon from his own head in the direction of the officers. Id. at 1168. We held that "[t]he officers reasonably reacted to what they perceived as an immediate threat of serious harm to themselves. This [wa]s exactly the type of 'tense, uncertain and rapidly evolving' crisis envisioned by the Supreme Court." Id. (quoting Graham, 490 U.S. at 397, 109 S. Ct. at 1872). In fact, we concluded that the use of lethal force would have been reasonable even if the suicidal man had not pointed his weapon in the officers' direction. Id. at 1169. We noted that "the fact that Garczynski did not comply with the officers' repeated commands to drop his gun justified the use of deadly force under these particular circumstances." Id. Similarly, here, Mr. Penley refused to comply with commands to drop his weapon, was unresponsive to negotiation efforts, and repeatedly pointed his weapon at police officers.

16

The Penleys' reliance on Sergeant Brubaker's statement that he did not feel threatened is misplaced. The relevant question is whether a reasonable officer in Lieutenant Weippert's shoes would have believed that Mr. Penley was gravely dangerous. As the Penleys themselves emphasize, Graham v. Connor requires an evaluation of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them." 490 U.S. at 397, 109 S. Ct. at 1872. Whether Lieutenant Weippert's conduct was objectively reasonable must be evaluated from the perspective of "'a reasonable officer possessing the same particularized information as the subject officer.'" Carr, 338 F.3d at 1269 n.19 (quoting McLenagan v. Karnes, 27 F.3d 1002, 1007 (4th Cir. 1994) (alteration omitted)); see also Garczynski, 573 F.3d at 1166–67 (conducting Fourth Amendment analysis based on information known to the subject officers without imputing knowledge known to colleagues positioned elsewhere). Sergeant Brubaker's perspective was far from identical to that of Lieutenant Weippert. Uncontroverted evidence demonstrates that Mr. Penley never pointed his weapon at Sergeant Brubaker. At various times during his negotiations with Mr. Penley, Sergeant Brubaker lost sight of the weapon and could not see at whom or what Mr. Penley aimed. In fact, at the moment that Lieutenant Weippert shot Mr. Penley, the sergeant could not see Mr. Penley at all. Accordingly, Sergeant Brubaker's

17

subjective lack of fear sheds little light on whether Lieutenant Weippert's conduct was objectively reasonable.[3]

The bulk of the Penleys' appeal amounts to a challenge to the district court's conclusion that no issues of fact preclude summary judgment. However, we find no error in the district court's decision that summary judgment was warranted. The Penleys argue that Lieutenant Weippert knew that the buildings around him had been evacuated. But, the deposition of Sergeant Vincent Kauffman, the portion of the record to which the Penleys cite, does not support this contention. Instead it indicates no more than that one of the nearby classrooms was evacuated. Sergeant Kauffman's testimony suggests neither that all surrounding classrooms were evacuated nor that Lieutenant Weippert was aware of any evacuation. Furthermore, in a portion of Sergeant Kauffman's deposition not cited by the Penleys, he testified that "we had a whole campus full of students. Albeit they're in lockdown, some of them were just behind glass." This testimony does not contradict Lieutenant Weippert's own statement that when he moved to join Deputy Maiorano, there were children—or at least he believed that there were

_____

[3] It is worth noting that Deputy Maiorano, the officer in closest proximity to Lieutenant Weippert, reported in a sworn statement, "from where I was standing, that was a big gun, . . . when he . . . drew down on me—I've been in a lot of situations—I was scared, noticeably scared." In fact, he testified that he would have made the same decision as Lieutenant Weippert: "Based on [Mr. Penley's] previous mannerisms and behavior towards me and the fear that I felt that day, I would have shot him myself."

children—in the portable classroom immediately adjacent to the bathroom. Lieutenant Weippert also testified about his concern for the students located in the classrooms behind the deputies, whose presence was corroborated by the sworn statement of Sergeant Johnson. Though factual inferences are made in the Penleys' favor, this rule applies only "*to the extent supportable by the record*," Scott, 550 U.S. at 381 n.8, 127 S. Ct. at 1776 n.8, and here the record supports the district court's finding that children occupied at least one other classroom behind Lieutenant Weippert's position.

Furthermore, even absent the presence of students, Lieutenant Weippert would have been justified in using deadly force because he had "probable cause to believe that his own life [was] in peril." See Robinson, 415 F.3d at 1256. Mr. Penley was not responding to the negotiator's questions; he did not comply with commands to drop his weapon; and he pointed his weapon at Lieutenant Weippert and Deputy Maiorano. Though the Penleys question Lieutenant Weippert's credibility, they offer no evidence to contradict these material facts.[4] In fact,

---

[4] The Penleys claim that a jury could find that "the physical evidence is not consistent with Lt. Weippert's version [of the event]." They imply, for instance, that Mr. Penley was not pointing his weapon at Lieutenant Weippert when he was killed, but, instead, was walking away from the door with his back to the officer.

However, the record does not support the position that Mr. Penley was walking away from Lieutenant Weippert when he was shot. The deposition and report of the Medical Examiner, to which the Penleys cite, describe Mr. Penley's wound, but do not shed light on how the boy's head and arms were positioned at the time he was shot. In fact, the wound is not inconsistent with Lieutenant Weippert's testimony about the last moments of this tragic standoff.

19

Deputy Maiorano confirmed that Mr. Penley pointed his gun at the officers. In light of these conditions and his experience as an officer, Lieutenant Weippert reasonably concluded that Mr. Penley posed an imminent threat, that Lieutenant Weippert's "life and certainly those lives around [him] were in danger," and that he could not "let [Mr. Penley] shoot . . . first."[5]

As set forth above, when examining whether an officer's use of deadly force is reasonable, we recognize that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397, 109 S. Ct. at 1872. So, "[w]e are loath to second-guess

_____

Meanwhile, Lieutenant Weippert and Sheriff Eslinger presented an expert report that explained that the wounds sustained were actually consistent with Mr. Penley's independent movements. Furthermore, Deputy Maiorano's testimony corroborates Lieutenant Weippert's version of the story. Consequently, the evidence to which the Penleys cite does not create a fact issue sufficient to alter our evaluation of Mr. Penley's posture towards Lieutenant Weippert and Deputy Maiorano and, therefore, does not preclude summary judgment.

[5] The Penleys also contend that because the officers had adequate cover and Mr. Penley was contained in the bathroom, any threat posed by Mr. Penley was "eliminated or significantly reduced," and, therefore, the use of deadly force was unreasonable and excessive.

However, the fact that Mr. Penley was surrounded would not have prevented him from firing a weapon at Lieutenant Weippert, Deputy Maiorano, other officers, or students behind windows in neighboring buildings. Even with all possible inferences construed in the Penleys' favor, the district court correctly concluded that the Penleys failed to demonstrate a genuine issue of material fact based on the issue of containment and cover. As we have noted in the past, where officers fear that delaying action would "risk a 'running gun battle' with an armed man who was potentially suicidal," Garczynski, 573 F.3d at 1163, the Constitution does not require "[t]he officers . . . to wait and see if [the suspect] remained stationary, or rely on . . . surrounding police officers to deter him should he suddenly become mobile," id. at 1167. "We think the police need not have taken that chance and hoped for the best." Scott, 550 U.S. at 385, 127 S. Ct. at 1778.

the decisions made by police officers in the field." Vaughan v. Cox, 343 F.3d 1323, 1331 (11th Cir. 2003). At bottom, the Penleys have asked us to question with 20/20 hindsight vision the field decision of a twenty-year veteran of the police force. The relevant inquiry remains whether Lieutenant Weippert "had probable cause to believe that [Mr. Penley] posed a threat of serious physical harm." See Robinson, 415 F.3d at 1256. In other words, would Mr. Penley "have appeared to reasonable police officers to have been gravely dangerous"? See Pace, 283 F.3d at 1281.[6] Under the tragic circumstances of this case and in light of this Court's

---

[6] The Penleys dedicate a significant portion of their briefs to the argument that Garner mandated Lieutenant Weippert to issue a warning before shooting Mr. Penley. Their argument fails for several reasons. First, as this Court has noted, "Garner says something about deadly force but not everything." Long, 508 F.3d at 580. The Supreme Court has also observed that "[w]hatever Garner said about the factors that *might have* justified shooting the suspect in that case, such 'preconditions' have scant applicability to [a] case[] which has vastly different facts." Scott, 550 U.S. at 383, 127 S. Ct. at 1777. The facts of this case are readily distinguishable from those of Garner. As summarized by the Supreme Court,

> Garner held that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect, by shooting him "in the back of the head" while he was running away on foot, and when the officer "could not reasonably have believed that [the suspect] . . . posed any threat," and "never attempted to justify his actions on any basis other than the need to prevent an escape."

Id. at 382–83, 127 S. Ct. at 1777 (citations omitted). Unlike in Garner, Lieutenant Weippert had probable cause to believe the suspect posed a real threat to the lives of officers and others. Mr. Penley was armed and not fleeing; he repeatedly refused to drop his weapon; and, at the moment Mr. Penley was shot, evidence demonstrates that he was pointing his weapon at Lieutenant Weippert.

We have "'decline[d] . . . to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where . . . such a warning might easily have cost the officer his life.'" Carr, 338 F.3d at 1269 n.19 (quoting McLenagan, 27 F.3d at 1007) (emphasis omitted). In this case, Mr. Penley had his weapon trained on Lieutenant Weippert, who believed that the boy was going to fire. Particularly in light

21

binding precedent, we must answer this question in the affirmative. We therefore

hold that Lieutenant Weippert did not violate Mr. Penley's constitutional rights,

thereby ending our qualified immunity analysis. See Saucier, 533 U.S. at 201, 121

S. Ct. at 2156.

B.

The Penleys have sued Sheriff Eslinger in his official capacity as Sheriff of

Seminole County.[7] "Official-capacity suits . . . generally represent only another

way of pleading an action against an entity of which an officer is an agent."

Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105 (1985) (citation

and internal quotation marks omitted). Absent a deprivation of federal rights,

Sheriff Eslinger cannot be liable in his official capacity under § 1983. See

Garczynski, 573 F.3d at 1170; Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir.

1996). Because we hold that Lieutenant Weippert did not deprive Mr. Penley of a

constitutional right, it is unnecessary for us to evaluate the constitutionality of

Sheriff Eslinger's use of force policy.

---

of various officers' repeated commands that Mr. Penley drop his weapon and the fact that the officers had their own guns pointed at Mr. Penley, Lieutenant Weippert's failure to explicitly warn Mr. Penley does not alter our conclusion that the use of lethal force was objectively reasonable. See id.

[7] Though they originally brought suit against Sheriff Eslinger both as an individual and in his official capacity, the Penleys abandoned their claims against the sheriff as an individual and amended their Complaint accordingly.

22

C.

The Penleys brought state law claims against both Lieutenant Weippert and Sheriff Eslinger, pursuant to Florida's Wrongful Death Act, Fla. Stat. §§ 768.16–.26. In its Amended Order, the district court deemed Lieutenant Weippert's conduct justifiable in light of the imminent threat posed by Mr. Penley and noted that the Penleys failed to present any evidence that would negate the lieutenant's privilege. It therefore granted summary judgment to Lieutenant Weippert and Sheriff Eslinger as to the Penleys' state law claims.

Under Florida law, "[a] person who uses force as permitted in § 776.012 . . . is justified in using such force and is immune from criminal prosecution and civil action for the use of such force." Fla. Stat. § 776.032. Section 776.012 of the Florida Statutes in turn establishes that individuals have no duty to retreat before using deadly force. Id. § 776.012. However, the statute limits the justifiable use of deadly force to instances in which the actor "reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another." Id. § 776.012(1).

As discussed at length above, Lieutenant Weippert's conduct was objectively reasonable and he had probable cause to believe that Mr. Penley posed a threat of great bodily harm to the lieutenant and others. Even when viewed in the

23

light most favorable to the Penleys, the evidence reveals no genuine issues of material fact as to whether Lieutenant Weippert's use of force was reasonably necessary. Under Florida law, Lieutenant Weippert had no duty to retreat and his use of force was justifiable. See State v. Rivera, 719 So. 2d 335, 337–38 (Fla. 5th DCA 1998) (holding that after being chased by a car-full of angry men, it would have been reasonable for Mr. Rivera, a private citizen, to believe that deadly force was necessary, even if only a single, unarmed pursuer had approached his now-stopped car, "because [the pursuer] and his friends had already threatened Rivera's life and the lives of other innocent people by engaging in a high-speed chase and throwing deadly missiles," namely a bottle of soda and a can of tuna); see also Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006) (relying on "facts and reasoning set forth" in Fourth Amendment analysis to evaluate whether, under Florida law, an officer's use of force was excessive).[8]

Because the use of force was justifiable, the district court did not err in granting summary judgment on the state law claims.

---

[8] Florida law also provides sovereign immunity to law enforcement personnel carrying out their duties, unless their actions were committed "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). Ordinarily, "a presumption of good faith attaches to an officer's use of force in making a lawful arrest and an officer is liable for damages only where the force used is clearly excessive." City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). The Penleys have presented no evidence that Lieutenant Weippert's actions were committed in bad faith, with malicious purpose, or in a manner exhibiting wanton and willful disregard of human rights.

**IV.**

Even with all facts viewed in a light favorable to the Penleys, Lieutenant Weippert's use of force was objectively reasonable and the Penleys' claims fail. In so holding, we do not mean to minimize the tragic nature of this case. However, the record reveals no evidence that reasonable jurors could find calls into question: whether Mr. Penley pointed his weapon at Lieutenant Weippert and Deputy Maiorano; whether Lieutenant Weippert reasonably believed that children remained in the vicinity of the standoff; or whether Mr. Penley refused to comply with repeated commands to drop his weapon. Accordingly, Lieutenant Weippert did not violate either the Constitution or Florida law when he shot Mr. Penley and the district court properly granted summary judgment.

For these reasons, the judgment of the district court is **AFFIRMED**.[9]

---

[9] Defendants have filed a motion to supplement the record on appeal. Their motion is **DENIED** as moot.