[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 20-13097
Non-Argument Calendar
_____

D.C. Docket No. 2:19-cv-00263-SPC-MRM

DAVID JOHN THORKELSON,
as Personal Representative of the
Estate of Debi Lyn Thorkelson,

Plaintiff-Appellant,

versus

CARMINE MARCENO,
in his official capacity as Sheriff of
Lee County, Florida,
ROBERT CASALE,
in his individual capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 23, 2021)

Before WILLIAM PRYOR, Chief Judge, WILSON and LAGOA, Circuit Judges.

PER CURIAM:

David John Thorkelson, as representative for his wife's estate, appeals the summary judgment against his complaint that Captain Robert Casale used excessive force in the fatal shooting of his wife, Debi Lyn Thorkelson. *See* 42 U.S.C. § 1983. After officers responded to Debi Thorkelson's 911 call, she kept the officers at bay for almost two hours by wielding a gun that resembled a hunting rifle and threatening "to kill" and "to shoot" them. A neighbor reported seeing Thorkelson pump her gun as if it were a BB gun, but Thorkelson stated she had "a rifle." When Thorkelson walked onto the back porch of her second-floor apartment and aimed her gun at an officer standing below her, Captain Casale shot her in the chest, which killed her instantly. The district court ruled that Sheriff Carmine Marceno and Captain Casale were entitled to qualified immunity. Because Thorkelson's husband mentions only Captain Casale in his brief, we deem abandoned any argument that could have been made challenging the summary judgment in favor of Sheriff Marceno. *See Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n. 6 (11th Cir. 1989). We affirm the summary judgment in Captain Casale's favor.

2

# I. BACKGROUND

Late one afternoon, Thorkelson called 911 from her apartment in Fort Myers Beach, but immediately ended the call. Deputy Matthew Woodby drove to Thorkelson's two-story apartment building and knocked on the front door of each unit without receiving any response. Thorkelson called 911 a second time and said, "Yea, please send police I'm in very, very danger." But when the officer asked for an address, Thorkelson replied, "I don't know. Are you f***ing kidding me? F*** you. F*** you."

One of Thorkelson's neighbors, T.J. Bryant, pulled into the parking lot and observed Deputy Woodby walking toward him. Bryant noticed that Thorkelson was pointing what appeared to be "a cock .22 single [rifle] or a pellet gun" at the deputy. Bryant thought Thorkelson might harm the deputy and warned him, "She's got a gun, she's got a gun." Bryant parked his car while the deputy retreated to his patrol car and requested that dispatch send backup officers.

Deputy Woodby could see Thorkelson holding something in her hands while standing in a screened area of the porch of her second-floor apartment, but a sun drape on her porch obstructed his view. Deputy Woodby asked Thorkelson to put her hands on the mesh screen to verify if she was armed. After a brief silence, Thorkelson yelled, "You're going to have to kill me or I'm going to kill you

3

mother f***er." The deputy also heard a clicking noise coming from Thorkelson's porch that sounded like a gun being fired without any ammunition.

Sergeant Paul Nader and other officers joined Deputy Woodby at his car and watched Thorkelson for about an hour as she paced around her porch and walked in and out of her apartment. Because the officers' line of vision was impaired by distance and the drape on Thorkelson's porch, Sergeant Nader shouted for Thorkelson to identify what she was holding. She replied, "I have a gun." The officers notified dispatch that Thorkelson had a "long gun."

Officers formed a perimeter around Thorkelson's apartment while Sergeant Nader retrieved his sniper rifle from his vehicle. Sergeant Nader intended to use the scope on his rifle to determine what type of gun Thorkelson possessed. But by the time he returned to Deputy Woodby's car, Thorkelson had retreated inside her apartment and closed her blinds. Sergeant Nader changed locations several times seeking an unobstructed view of Thorkelson's apartment. He finally found a second-story apartment about 25 feet from Thorkelson's building and positioned his rifle on a window facing her porch. Captain Casale retrieved his MP5 shotgun from his patrol car and occupied a carport located about 70 feet away from Thorkelson's apartment that had a clear view of her porch.

Throughout the standoff, officers attempted to communicate with Thorkelson. Two officers called Thorkelson's cellular telephone repeatedly. She

alternated hanging up and cursing loudly at the callers. She spoke once with Deputy Adam Linn and stated, "Stay away from me. I got a rifle. I'm gonna shoot you." From his balcony, Bryant heard Thorkelson standing on her porch threatening to shoot the officers. Bryant implored Thorkelson to "drop her gun," but she never responded to his remarks. After Thorkelson stopped answering her cellular telephone, Deputy Linn used his public address system to instruct her to put down her gun and to come outside.

The officers were unable to identify Thorkelson's gun. The owner of the apartment occupied by Sergeant Nader reported that Thorkelson appeared to pump her gun as if it was a BB gun. Thorkelson's husband called from work and said that Thorkelson had a BB gun. Thorkelson's brother, Wes Kalles, also reported that Thorkelson had a BB gun and that he was driving to her apartment, but the dispatch operator did not convey Kalles's message to the officers. Sergeant Nader saw Thorkelson poke a gun barrel through her blinds, but he could not determine through the scope on his rifle whether her gun was a rifle or a BB gun.

Thorkelson moved the blinds covering the sliding glass door to her porch, which provided Sergeant Nader an unobstructed view inside her apartment. Nader announced over the radio clipped to his shirt that Thorkelson had a rifle.

Thorkelson slid open the glass door and walked onto her porch. She raised her gun to her shoulder with her finger on the trigger and aimed down at Deputy

Linn. As Sergeant Nader returned his gaze to his scope, Deputy Casale shot

Thorkelson. The bullet passed through Thorkelson's chest, and she died instantly.

Officers who entered her apartment found a Crosman model 760 Pumpmaster BB

gun lying on the porch near Thorkelson.

## II. STANDARD OF REVIEW

We review *de novo* a summary judgment. *Nam Dang by & through Vina*

*Dang v. Sheriff, Seminole Cty. Fla.*, 871 F.3d 1272, 1278 (11th Cir. 2017).

Summary judgment is appropriate when there exists no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(a). We resolve all issues of material fact in favor of the plaintiff and then

address the legal question whether an officer is entitled to qualified immunity

using that version of the facts. *Penley v. Eslinger*, 605 F.3d 843, 848–49 (11th Cir.

2010).

## III. DISCUSSION

Thorkelson's husband argues that Captain Casale's use of lethal force was

unnecessary and violated the Fourth Amendment and state law. He contends that

the officers knew that Thorkelson had a BB gun and, in Florida, she was not

required to have a license to "openly carry" the gun, which "is not classified as a

firearm or a lethal weapon." He also contends that the officers should have used

"less intrusive force" because Thorkelson's "behavior remained consiste[nt]

throughout the standoff" and because she was mentally ill and never was "supplied a proper warning."

Qualified immunity shields government officials who are acting within their discretionary authority from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Nam Dang*, 871 F.3d at 1278 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). If an official is acting within the scope of his discretionary authority when he or she committed the allegedly unlawful actions, the plaintiff must prove "that qualified immunity is not appropriate." *Penley*, 605 F.3d at 849 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). "We are required to grant qualified immunity to a defendant official unless the plaintiff can demonstrate two things: (1) that the facts, when construed in the plaintiff's favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." *Singletary v. Vargas*, 804 F.3d 1174, 1180 (11th Cir. 2015). Because the parties agree that Captain Casale was acting within his discretionary authority when he shot Thorkelson, this appeal turns on whether he is entitled to qualified immunity. *See id.*

Thorkelson's husband argues that Captain Casale's use of force against Thorkelson was excessive. The Fourth Amendment right to be free from

unreasonable searches and seizures "encompasses the right to be free from excessive force during the course of a" seizure. *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009). Under federal and state law, an officer's use of force is evaluated for objective reasonableness. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. The force the officer employs "must be reasonably proportionate to the need for that force," as measured by, among other factors, the danger posed to officers on the scene. *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018).

Captain Casale acted reasonably when he employed deadly force against Thorkelson. When an "officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution." *Penley*, 605 F.3d at 851. Thorkelson was behaving erratically and ignoring officers' repeated requests to disarm and to come out of her apartment. "Non-compliance of this sort supports the conclusion that use of deadly force was reasonable." *Id.* Thorkelson wielded a gun that resembled and that she described as a lethal firearm. She threatened "to kill" and "to shoot" officers. Even though "an officer is not required to wait until an armed and

dangerous [person] has drawn a bead on the officer or others before using deadly force," Captain Casale did. *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997). Officers did not use any force during the lengthy period that Thorkelson was unapproachable and menacing. Captain Casale shot Thorkelson only when she posed an imminent threat to a defenseless officer. Captain Casale was not required to warn Thorkelson before firing when that delay might have cost Deputy Linn his life. *See Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003).

Captain Casale's decision was reasonable. Reasonableness is judged based on "only the facts that were knowable to the defendant officers" at the time. *White v. Pauly*, 137 S. Ct. 548, 550 (2017). As the Supreme Court has explained, we must refrain from "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012); *see Long v. Slaton*, 508 F.3d 576, 580 (11th Cir. 2007). Thorkelson was holding a BB gun, but that fact was not evident to the officers. *See Carr*, 338 F.3d at 1269 ("A reasonable but mistaken belief that probable cause exists for using deadly force is not actionable under § 1983."). Bryant, Thorkelson's neighbor, thought she possessed a lethal firearm and warned Deputy Woodby to take cover. Although the owner of the apartment occupied by Sergeant Nader reported seeing Thorkelson pump her gun like a BB gun, the gun resembled and Thompson stated that she had "a rifle." Thorkelson's husband reported that she

had a BB gun, but he was not at the scene to observe what was in her hand. And the officers never had an unimpeded view of Thorkelson's gun. Captain Casale had to make a split-second decision whether to shoot an unpredictable woman armed with a dangerous weapon aimed at a fellow officer. He was not required "to wait 'and hope for the best.'" *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)) (alteration adopted). Captain Casale's use of deadly force did not violate the Fourth Amendment or Florida law.

## IV. CONCLUSION

We **AFFIRM** the summary judgment in favor of Sheriff Marceno and Captain Casale.