[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10244

Non-Argument Calendar

_____

WILLIAM ROBERT LEONARD,

Plaintiff-Appellant,

*versus*

SHERIFF GREGORY TONY
individually and in his official capacity as
Sheriff of Broward County, et al.,

Defendants,

CHRISTIAN SILVA,
individually for actions taken in his official
capacity as Deputy Sheriff for the Broward
County Sheriffs Office,

ROBERT O'DOR,
individually for actions taken in his official
capacity as Deputy Sheriff for the Broward
County Sheriffs Office,
MITCHELL MACHADO,
individually for actions taken in his official
capacity as Deputy Sheriff for the Broward
County Sheriffs Office,
BROWARD COUNTY SHERIFF'S OFFICE,

                                                    Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cv-60627-CMA

_____

Before ROSENBAUM, JILL PRYOR, and BLACK, Circuit Judges.

PER CURIAM:

William Robert Leonard, as Personal Representative of the Estate of Jarvis Randall, appeals the district court's grant of summary judgment to Sergeant Christian Silva, Deputy Robert O'Dor, Deputy Mitchell Machado, and the Broward County Sheriff's Office (BSO) in Leonard's 42 U.S.C. § 1983 excessive force claims against Silva, O'Dor, and Machado, and state battery claims against

Silva, O'Dor, Machado, and the BSO. Leonard contends the district court erred in making several fact determinations in granting summary judgment, and that these disputed issues of material fact make this case appropriate for a jury trial. After review, we affirm the district court's grant of summary judgment.

## I. FACTUAL BACKGROUND[1]

This case arises out of the shooting death of Jarvis Randall at the Mental Health Pavilion at University Hospital in Tamarac, Florida. Randall was a patient at the facility who was admitted under the Baker Act[2] on November 20, 2018. Randall exhibited psychosis with suicidal ideation and aggressive behavior and was diagnosed with bipolar depression. Randall made some progress during his first week at the Pavilion, but he then learned his father passed away. Learning of his father's death resulted in his depression worsening and he exhibited suicidal thoughts and aggressive behaviors requiring significant interventions and emergency treatment medications to calm him down. Randall wanted to leave the Pavilion to attend his father's funeral. Although Randall's providers had contemplated a discharge plan for his release, no final

---

[1] Because we review all evidence in favor of the non-moving party, we use both those portions of the "Defendants' Statement of Undisputed Facts in Support of Motion for Summary Judgment" that the Plaintiff did not dispute in his response, as well as facts that are captured in the video evidence on which there can be no genuine dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

[2] The Florida Mental Health Act of 1971, §§ 394.451-394.4781, Fla. Stat., is commonly known as the "Baker Act" and allows the emergency involuntary institutionalization and examination of an individual.

decision had been made as to his release because Randall "had limited resources, no access to basic necessities or living arrangements, and no health care provider."

The video footage of the events at the Pavilion on December 1, 2018, is extensive. Almost all of the following facts are observable on the video from the officers' body-worn cameras (BWC) or the video from cameras in the hospital. On December 1, Randall refused his medication around 9:30 p.m. Later, he appeared at the nurses' station, requesting to leave and stating that he was going to stab someone. He was told he could not leave, and Randall refused medication to help him calm down and walked back to his room. He then returned to the nurses' station with a pencil in one hand and a shampoo bottle in the other, yelling that he wanted to leave. He threw the shampoo bottle at the light, and jumped up and punched the light and the fire extinguisher. Randall then breached security by kicking through locked doors, and ended up in an unoccupied outpatient area.

Hospital staff notified security and the Director of the facility, who advised the staff to call the police. BSO dispatch received two 911 calls reporting the incident. Deputies Belisario Amaris and Lisa Almanza-Londono were the first BSO deputies to arrive on the scene, and they were informed Randall was armed with a pencil. The deputies observed Randall standing in a hallway bordered by two exits—one an emergency exit to the outside, and the other double doors leading to patient rooms and hospital staff. The two BSO deputies were located outside the double doors, one of which

was open and Randall and the deputies could see and talk to each other. When the deputies attempted to talk to Randall, he made several statements to them that he did not want to live anymore, that he was going to make the officers shoot and kill him, and that no one could save him. Randall stated he did not want to talk to or listen to the deputies, and repeatedly kicked the door that exited outside.

Randall began walking toward the double doors and said he would make Deputy Almanza-Londono use her gun. Randall then walked back to the exit door when Deputy Amaris said they would give Randall space. Randall picked up a stand containing pamphlets and dumped the pamphlets on the floor. Randall once again told the deputies to shoot him, and then used the pamphlet stand to knock out a light on the ceiling, causing plexiglass to shatter on the floor. He began shattering larger pieces of plexiglass on a table to fashion into smaller shards of plexiglass. Randall then told Deputy Almanza-Londono, "You know I'm fixing to come at you," and she responded, "Why are you doing that to us?" Randall stated he did not want to live anymore and that the hospital would not let him go, even though they were supposed to let him go yesterday. He repeated that he was going to make them shoot him and that they could not help him. Over the course of several minutes, Randall wrapped part of the plexiglass with pamphlets to protect his hands. Randall began approaching the double doors where the officers were located, and the officers backed up further away from him. Randall then shut the door that had been opened, closing himself in the hallway.

Randall opened one of the double doors again, stating the police had not left yet even though he had asked them to. Deputy Almanza-Londono asked him to stay where he was and back off, and reiterated that they did not want to kill him. Randall kept coming toward the officers with the plexiglass shards in his hands, and the officers kept backing away from him. Randall warned the officers not to tase him because that was only going to make him rush them, and that he had on two sweatshirts so a taser would not work. Randall then went back through the double doors and closed himself in the hallway again. By this time, backup had arrived, and more officers were in the hallway.

Deputy Machado arrived and asked for an officer with a "less lethal" method of resolving the situation. Deputy Wilson DeJesus then arrived with a "less lethal" launcher which used bean bags. Deputy DeJesus began speaking to Randall through the closed double doors and told Randall he did not want to kill him. Randall stated he did not want to live anymore. Deputy DeJesus offered to help him, but Randall said Deputy DeJesus could not help him.

Deputy DeJesus told the other officers not to shoot their guns just because they heard the sound of the less lethal launcher. Deputy DeJesus and other officers discussed Randall's location between the double doors and the emergency exit door, and that there was broken plexiglass on the ground on the other side of the double doors that Randall had broken. Deputy DeJesus stated that he would not have to walk in the double doors because his less lethal launcher would reach far enough. Deputy DeJesus told

Randall that if he opened the door, he would deploy his less lethal launcher and it was going to hurt.

Sergeant Silva, a supervisor, developed a plan to open one of the double doors, DeJesus to use the less lethal launcher, Deputy Riggs to have a taser ready to use, and Deputy Machado and Deputy O'Dor to use lethal force if necessary. Sergeant Silva then directed one of the officers standing guard outside the emergency exit door on the other side of the hallway, to tap on the door and create a distraction so that Randall would back up away from the double doors before Deputy DeJesus deployed the less lethal launcher.

When the door opened, Deputy DeJesus deployed the less lethal launcher, but its shots either did not hit or did not subdue Randall. Randall kept coming toward the open door with shards of plexiglass in his hands. Deputy Machado, Deputy O'Dor, and Sergeant Silva then discharged their firearms as Randall crossed the threshold of the double doors, hitting Randall multiple times. Fire rescue transported Randall to the hospital where he passed away.

## II. PROCEDURAL BACKGROUND

Leonard filed a Complaint in state court on November 6, 2020, and the case was removed to the Southern District of Florida on March 22, 2021. As relevant to this appeal, Leonard asserted Sergeant Silva, Deputy O'Dor, and Deputy Machado violated Randall's constitutional rights with excessive use of force, 42 U.S.C. § 1983. Leonard also asserted state battery claims against Sergeant

Silva, Deputy O'Dor, Deputy Machado, and the BSO (collectively, the BSO Defendants)

The BSO Defendants moved for summary judgment on the excessive force and battery claims, asserting they were entitled to qualified immunity on the excessive force claims, and that there was no issue of fact that their actions were reasonable under the circumstances as to the battery claims. Leonard opposed summary judgment, arguing it was precluded because there were disputed facts that must be weighed by a jury and the BSO Defendants actions were unreasonable. Specifically, Leonard contended that disputed facts regarding (1) whether Randall was armed with a lethal weapon, (2) whether Randall was contained, and (3) whether the BSO Defendants adequately de-escalated the situation precluded summary judgment.

### III. DISTRICT COURT ORDER

The district court granted summary judgment to the BSO Defendants. The court began by discussing the disputed facts raised by Leonard to determine whether they precluded summary judgment. As to whether Randall had a lethal weapon, Leonard relied on the testimony of an expert who testified the plexiglass was brittle, not a bladed weapon, and would not damage someone to a "great extent." And the hospital staff testified the pencil given to Randall was a special 10 cm long pencil given to patients because it lacks a metal tip and is too short to cause injury. The district court considered this testimony, but also noted the same expert had stated the plexiglass was sharp, was wrapped in pamphlets to

prevent injury to Randall's hands, and could cause injury, a puncture or even death had Randall reached the BSO officers and punctured a jugular.

However, regardless of the actual characteristics of the pencil or plexiglass, the court found there was no issue of fact that both items were used in a threatening manner that could reasonably be perceived by officers on the scene as being capable of causing serious harm. *See Penley v. Eslinger*, 605 F.3d 843, 852 (11th Cir. 2010) (stating "[t]he relevant question is whether a reasonable officer in [an officer's] shoes would have believed that [Randall] was gravely dangerous"). The 911 callers stated Randall was threatening to stab hospital staff in the neck with a pencil, and hospital staff told BSO deputies upon arrival that Randall was threatening to stab people with a pencil. Further, Randall covered the plexiglass with pamphlets to protect his hands from injury and threatened the BSO deputies with his plexiglass, and he said he would charge at them, that the plexiglass could cut skin easily, and that it was either going to be him or the BSO deputies who would die. The first BSO deputies on the scene also warned the later-arriving officers as they arrived about Randall having glass, suggesting that it was dangerous if Randall charged at them. The reasonableness of the use of force must be judged from the perspective of a reasonable officer on the scene rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The district court determined information not known by the officers about the non-lethality of the plexiglass and pencil was immaterial to the qualified immunity analysis which focuses on whether an officer's actions were

objectively reasonable in light of the facts and circumstances confronting them.

As to whether Randall was contained, Leonard asserted hospital staff and BSO officers had described Randall as contained or barricaded in the hallway, and Deputy Machado and Sergeant Silva said Randall was not a threat while he was in the hallway. The district court rejected that a jury could reasonably find the officers used excessive force under these facts because "the record also shows that Randall could have left the hallway and engaged with" the BSO officers. The court reasoned "[t]he record here shows that it was possible for Randall to leave the hallway and was 'contained' only in so far as [BSO officers] were stationed at both exits." The double doors were unlocked, and Randall could have opened them at any time to engage with the officers. While the emergency exit door was locked, Randall had been kicking it, and hospital staff told BSO officers the door could be unlocked with three pushes. The court determined the dispute between the meaning of contained and barricaded did not matter for purposes of summary judgment because it was "undisputed that Randall could have left the hallway."

As to whether the BSO officers failed to adequately de-escalate the situation, Leonard asserts Deputy DeJesus yelled at and threatened Randall, Sergeant Silva was on the scene only a short time before coming up with his plan and did not interact with Randall, no negotiator was called, and certain de-escalation techniques were not used. Leonard's expert witness testified there were

alternative solutions that should have been attempted to de-escalate the situation.

The district court determined even if it assumed alternate de-escalation techniques were possible or warranted, summary judgment would not be precluded. Basically, that the officers could have acted differently did not preclude summary judgment because "so long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot succeed by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate or even reckless." *Knight v. Miami-Dade Cnty.*, 856 F.3d 795, 813-814 (11th Cir. 2017) (quotation marks omitted).

Having found the disputed facts did not preclude summary judgment, the district court turned to whether Leonard had shown a violation of clearly established constitutional law. The court cited *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005), which states it is "constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." The court noted the following undisputed facts:

> (1) the 911 calls and BWC footage reflect Hospital staff telling dispatch and several BSO deputies that Randall was armed with a pencil and glass and threatening to stab people—with one 911 caller adding that Randall was attempting to stab people—and this information was conveyed to Sergeant Silva; (2) Randall, while holding plexiglass in pamphlets to

seemingly protect his hands, made suicidal statements, such as that he would force the BSO deputies to kill him, that either he or the BSO deputies would die in the encounter, that other BCSO deputies were not going to have time to arrive before something happened, and he would charge at the BSO deputies with a weapon he claimed could go through skin easily—with the Deputy Defendants either hearing this or receiving secondhand accounts from other BSO deputies; (3) Randall resisted arrest and stated he did not want to listen to BSO deputies or surrender—these events were witnessed by the Deputy Defendants or conveyed to them; (4) Randall could exit the southern unlocked door and engage the Deputy Defendants, and the Deputy Defendants were told Randall could open the locked emergency door to the north; (5) the Deputy Defendants—before using lethal force—tried to subdue Randall with a less lethal launcher; and (6) it was only after the less lethal launcher was unsuccessful and Randall charged at the Deputy Defendants with plexiglass that the Deputy Defendants used deadly force to shoot Randall. (Citations omitted).

The district court determined the facts showed a reasonable officer likely would have perceived Randall as posing an imminent threat of serious physical harm.

However, even assuming a constitutional violation, the district court concluded Leonard could not show from clearly established law that the officers had fair and clear notice that their actions were unconstitutional. The cases cited by Leonard had facts including fleeing suspects who made no threats and had no visible weapons, in contrast to Randall's undisputed threats of violence and charging at officers with plexiglass in his hands. Thus, Leonard was unable to meet his burden to overcome the Deputy Defendants' qualified immunity defense.

Lastly, the district court stated its finding that the Deputy Defendants acted reasonably under the facts also applied to the battery claims. Because the Deputy Defendants acted reasonably under the circumstances, the state law battery claims also failed, and the district court granted summary judgment on those claims as well.

## IV. ANALYSIS

Leonard contends the district court erred in granting qualified immunity to the BSO Defendants and granting summary judgment on the state battery claims because (1) the district court erred in making the factual determination that Randall was a felon fleeing arrest; (2) the district court erred in making the determination there was an immediate threat of harm posed by the objects in Randall's hands; (3) the district court erred in making the determination that Randall was not contained; (4) the district court erred in resolving the factual dispute about whether appropriate de-escalation occurred and in declining to consider the officer's testimony

regarding their understanding of reasonable de-escalation; (5) the district court erred in making a finding regarding Randall's intent with respect to whether he engaged in dialogue; (6) the district court erred in finding the officers acted reasonably in disposing of the battery claims.

We have conducted a *de novo* review of this case, reading the record and watching the video evidence. *See Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1352 (11th Cir. 2015) ("We review *de novo* a grant of summary judgment on the basis of qualified immunity, drawing all inferences and viewing all evidence in the light most favorable to the nonmoving party."). After this review, we affirm the district court. As to Leonard's contentions on appeal, (1) the district court did not make a factual finding that Randall was a felon fleeing arrest; (2) the district court did not err in determining that the plexiglass was used in a threatening manner that could reasonably be perceived by officers on the scene as being capable of causing serious harm; (3) the district court did not err in determining Randall was not contained because he could open the double doors at any time and could unlock the emergency exit door (which he had been kicking) with three pushes; (4) the district court did not err in determining that even if alternative de-escalation techniques were appropriate, "[s]o long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot succeed by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate or even reckless"; and (5) the district court did not err

in determining Randall made several statements that did not show an intent to engage in dialogue.

The district court also did not err in concluding that an officer reasonably could have believed that Randall posed a threat of serious physical harm, either to the officer or others and that it was reasonable and constitutionally permissible for an officer to use deadly force against a person who posed an imminent threat of serious physical harm to the officers or others. *See Robinson*, 415 F.3d at 1255-56. And, even assuming a constitutional violation, no clearly established law put the officers on notice that their conduct was unconstitutional. Thus, the district court did not err in granting qualified immunity to Sergeant Silva, Deputy Machado, and Deputy O'Dor. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.").

Lastly, the district court did not err in concluding Leonard's state law battery claims also failed as the use of force was reasonable under the circumstances. *See Johnson v. City of Miami Beach*, 18 F.4th 1267, 1275 (11th Cir. 2021) (explaining Florida law considers excessive force used by police officers as battery, and determines whether the force was excessive by considering whether the amount of force was reasonable under the circumstances).

## V. CONCLUSION

We affirm the district court's grant of summary judgment.[3]

**AFFRIMED.**

---

[3] Leonard contends the district court erred in denying his motion to alter or amend judgment for lack of jurisdiction. We agree the district court should not have denied for a lack of jurisdiction, as the district court still had jurisdiction over the portion of the case for which Leonard was requesting consideration. However, we may affirm on any ground supported by the record, regardless of whether that ground was relied upon or considered below. *PDVSA US Litig. Tr. V. LukOil Pan Ams. LLC*, 65 F.4th 556, 562 (11th Cir. 2023). There was no abuse of discretion in denying the motion to alter or amend as Leonard's argument regarding the timing and manner of the decision to use less lethal force as unreasonable was not clearly raised in the response to the summary judgment motion, and, in any case, that argument would fail for the same reasons as the discussion on lethal force. *See Raney v. Aware Woman Ctr. for Choice, Inc.*, 224 F.3d 1266, 1268 (11th Cir. 2000).