[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11207
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-01036-WMR


L. T.,
by her guardian, Cajun Snorton, as the surviving child
of Nicholas Thomas Cajun Snorton,
CAJUN SNORTON,
as administrator of the estate of Nicholas Thomas,

Plaintiffs - Appellants,

versus

SMYRNA POLICE LT. KENNETH OWENS,
in his individual capacity,
CITY OF SMYRNA,

Defendants - Appellees,

D. VICTOR REYNOLDS, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(April 2, 2020)

Before MARTIN, ROSENBAUM, and FAY, Circuit Judges.

PER CURIAM:

On March 24, 2015, Kenneth Owens, an officer with the Smyrna Police Department, shot and killed Nicholas Thomas in a vehicle while Owens and several other police officers attempted to serve an arrest warrant on Thomas for technical probation violations.  After Thomas's death, Plaintiffs L.T., as the surviving child of Thomas, and Cajun Snorton, as L.T.'s guardian and administrator of Thomas's estate (collectively, "Plaintiffs"), filed suit under 42 U.S.C. § 1983 alleging that Owens used excessive force in violation of the Fourth Amendment and that the City of Smyrna ("City") negligently hired and retained Owens.  Plaintiffs also sued the City for battery and negligent shooting under Georgia law based on a theory of vicarious liability.  The district court granted summary judgment to Owens and the City, and Plaintiffs appeal.  After careful review, we affirm.

**I.**

On the afternoon of March 24, 2015, three uniformed Smyrna police officers—Owens, Mark Cole, and Chris Graeff (collectively, the "Smyrna

2

officers")—and three uniformed Cobb County police officers—Daniel Mangold, Bryan Moore, and Robert Dorsey (collectively, the "Cobb officers")—went to serve an arrest warrant on Thomas at a Goodyear store in Cobb County, Georgia, where Thomas worked. The parties agree that the following aerial image accurately depicts the Goodyear store and its environs on that date. Like the parties, we rely on the directions represented on the image, though we do not vouch for their accuracy.[1]



Before arriving at Goodyear, the officers met in a nearby Publix parking lot to plan an approach. During this meeting, the officers reviewed a copy of the

---

[1] We also note that the deposition testimony does not uniformly follow the directional orientation represented in the aerial image.

3

warrant, which was for technical probation violations, and discussed pertinent information about Thomas from a law-enforcement database, including that he had "violent tendencies" and a prior history of "aggravated assault/fleeing or attempting to elude."

After the briefing, the Smyrna officers drove to Goodyear in their respective marked patrol cars and parked in a line, effectively blocking the only way to enter or leave the premises in a car without jumping a curb. They exited their cars and split up. Meanwhile, Mangold and Moore approached Goodyear on foot from the Publix parking lot and positioned themselves near the south end of the premises. Dorsey arrived at Goodyear soon after and parked beside the Smyrna officers' cars, completely blocking the driveway.

The plan was for the Smyrna officers to attempt to execute the warrant at Goodyear while the Cobb officers remained outside in case Thomas attempted to flee on foot. Cole went to talk with some employees who were outside on the east of the building; Graeff approached the Goodyear lobby; and Owens remained near the patrol cars. The Goodyear employees told Cole that Thomas was driving a white Maserati—a customer's car—that had just pulled around behind the building. Around this time, Owens heard what sounded like a "fastly accelerating vehicle" from behind the building.

4

What followed over the two minutes was a cat-and-mouse game contained within the Goodyear parking lot. Thomas made five passes behind the building on its west side in the Maserati, three going forward and two going backward. Throughout this time, the officers chased the car on foot and, each time the car stopped and changed directions, ordered Thomas at gunpoint to stop and exit the car. Thomas was shot and killed on the fifth pass.

## A.

Thomas made the first pass just as the officers were arriving. Beginning near the front (east) side of the building, Thomas drove the Maserati clockwise around the building, ultimately ending up on the north end, his escape blocked by the line of police vehicles. Cole yelled out that Thomas was in the Maserati, and the Smyrna officers ran to meet it on the north end of the building. When they arrived, they ordered Thomas at gunpoint to stop and exit the car.

On the second pass, Thomas reversed, went around the northwest corner, and accelerated backward towards the southwest corner, where he stopped the Maserati about ten feet from the place Cobb officer Moore was stationed. Moore, at gunpoint, yelled for Thomas to stop and exit the car. Meanwhile, Cole ran to his truck and released his canine, Paco, believing that Thomas intended to flee on foot. Cole then joined Graeff in running after the Maserati.

5

The third pass was the opposite of the previous one. Just as Cole and Graeff rounded the northwest corner, they saw the Maserati quickly accelerate towards them down the middle of the paved pathway behind the building. Cole testified that Thomas tried to "run [him] over" and that he had "to jump out of the way" to avoid being hit by the oncoming car, which missed him by about a foot. Graeff testified that the car was coming towards them at "a high rate of speed" and that he "got as tight as [he] could" to the building to avoid the car as it passed. Video evidence[2] corroborates their testimony. The video depicts two officers rounding the northwest corner in pursuit of the Maserati. Just after the officers appeared on the video, Thomas accelerated towards the officers and drove between them in very close proximity to one of the officers, who stepped aside when the car passed. Thomas again drove around the northwest corner towards the parked patrol cars and came to a stop along the north end of the building.

On the fourth pass, Thomas reversed and headed back around the building in a counterclockwise direction, ultimately stopping near the southeast corner, where Cobb officer Mangold was located. Meanwhile, the Smyrna officers split up and ran after the Maserati. Video evidence depicts Owens running south on the back (west) side of Goodyear and going out of view near the southwest corner, where the north-

---

[2] The record contains a composite video (no audio) of four surveillance cameras at the Goodyear. The surveillance camera most relevant to this appeal was located near the southwest corner and looking towards the northwest corner.

facing camera was located. Cole, running in the same direction and holding his canine by the collar, went out of view about seven seconds later. Meanwhile, Graeff testified that he was on the east side of the building when he saw the Maserati accelerate forward after stopping at the southeast corner. He entered a bay door and cut through Goodyear's interior service area, running to meet the car on the west side.

Thomas was shot and killed on the fifth and final pass. After sitting near the southeast corner for a few seconds, he accelerated the Maserati towards the southwest corner and began to turn. As the car was turning, Owens fired three shots in quick succession into the passenger side of the car, one of which struck Thomas causing his death.[3] The Maserati continued forward, jumping the curb near the northwest corner and coming to rest on the grass. The officers broke the heavily tinted windows using less-lethal force and discovered that Thomas had been shot and was unresponsive. He was pronounced dead at the scene.

**B.**

The central factual dispute concerns the location of Cole and Owens when Owens fired at Thomas. In Owens's version, he rounded the southwest corner and saw the Maserati, which was not moving, and ordered Thomas at gunpoint to stop

---

[3] According to Owens, this was the first time he had fired his service weapon while on duty in 22 years in law enforcement. **]**

and exit the car.  The car then accelerated very quickly at him.  Owens stepped back to avoid the oncoming car, which "just barely missed [him]," and then, seeing Cole approach the southwest corner in the path of the turning car, fired three shots into the car's passenger side.  Owens estimated that he began shooting when Cole was about ten feet in front of the car.

Cole's version of events differed from Owens's.  When the shooting occurred, according to Cole, he was beside the Maserati, not in front of it, and "extremely close" to Owens.[4]  Just before the shooting, Cole explained, he had gained control of his dog, which was running loose until then, and began running down the backside of the building towards the southwest corner.  He rounded the corner and saw the Maserati begin to accelerate, at which point his testimony becomes unclear.  He indicated that, as the car accelerated forward, he "turn[ed] around with [his] dog" and started "going back in the opposite direction."  When asked whether he was "in the path of the car" and whether it was "coming at you," Cole could not provide a clear answer.  He responded that he was "very close to the car" and that it passed by him in "close proximity."  He estimated that he was beside the front passenger window and "going back in that direction" when he heard the first of three gunshots

---

[4] Owens, when asked to explain the differences between Cole's testimony and his own, stated, "I couldn't really understand a lot of what Officer Cole explained in his testimony.  It seemed to me that maybe he—he couldn't perceive or say exactly what was going on, and all I can figure is he don't know where he was in relation to the car because he was trying to take care of his dog."

from "right behind [him] on [his] left side." Cole stressed that he did not know why Owens fired his gun but assumed that Owens "saw something that I couldn't see."

The record contains no other witness testimony about the shooting. Nevertheless, Plaintiffs propose a third version of events regarding the final pass. Plaintiffs contend that Cole and Owen both had reached the Maserati on the south end and were located on either side of the car when it began to accelerate. Then, according to Plaintiffs, the officers chased after the car, which posed no danger to them, and Owens fired three shots as the car rounded the southwest corner.

In support of this version of events, Plaintiffs cite Cole's interview with Cobb police investigators after the incident, during which Cole identified the south end of the building as where he struck the driver's side window of the stopped Maserati with his baton. That, in turn, would place Cole to the side of Thomas's car on the south end *before* the final pass. Arguably consistent with this version of events, Cole testified that, after running south around the southwest corner and seeing the Maserati accelerate, he "turned around" and started "going back in the opposite direction"—suggesting that Cole may have been running after the car when Owens opened fire.

## C.

Construing the evidence in the light most favorable to Plaintiffs, we can rule out that Cole was in the path of the Maserati when Owens opened fire. Cole testified

that he was beside the car when he heard the first gunshot and did not know why Owens shot. We also know that Owens was not in immediate personal danger when he fired at the Maserati, which had passed him. And there were no other officers in the immediate path of the car at the time of the shooting.

As to whether Cole was beside or behind the car when Owens opened fire, we will assume without deciding that a reasonable jury could conclude that neither Owens nor Cole was in imminent danger of being hit near the southwest corner when Owens shot and killed Thomas.

## II.

Plaintiffs sued Owens and the City in March 2017.[5] In the operative amended complaint, Plaintiffs alleged under § 1983 that Owens violated Thomas's right to be free from excessive force, and that the City negligently hired and retained Owens because, in their view, he was barred from possessing a firearm by federal law due to a prior conviction for domestic violence. Plaintiffs also asserted state-law claims alleging that the City was vicariously liable for an alleged battery and negligent shooting of Thomas by Owens.

Owens and the City filed separate motions for summary judgment in December 2018, which Plaintiffs opposed. Three months after those motions were

---

[5] Two other defendants were voluntarily dismissed early in the case.

filed, well after the deadline for amendment, and three days before the scheduled hearing on the summary-judgment motions, Plaintiffs moved to amend the complaint to add a state-law negligence claim directly against the City, on the same or similar grounds as the § 1983 claim against the City.

The district court held a hearing on the summary-judgment motions on March 15, 2019, deferring ruling at that time. Three days later, the court notified the parties that it intended to grant summary judgment to the defendants, and it asked them to prepare a joint proposed order to that effect. The defendants did so, and the court adopted the proposed order nearly verbatim.[6]

In its summary-judgment order, the district court concluded that Owens's use of deadly force was objectively reasonable, and that even if Owens used excessive force, the unlawfulness of that conduct was not clearly established. With regard to the claims against the City, the court concluded that the § 1983 claim had no merit because Owens was not prohibited from possessing a firearm under federal law, that

---

[6] We remind the district court that it should not employ this practice. "We have consistently frowned upon the practice of delegating the task of drafting important opinions to litigants, and the cases admonishing trial courts for the verbatim adoption of proposed orders drafted by litigants are legion." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997) (quotation marks omitted) (alteration adopted)). As we explained in *Chudasama*, "[t]his practice harms the quality of the district court's deliberative process, impedes our ability to review the district court's decisions, and creates the potential for overreaching and exaggeration on the part of attorneys preparing findings of fact when they have already been informed that the judge has decided in their favor." *Id.* (citations and quotation marks omitted). Nevertheless, the court's adoption of the defendants' draft order "does not affect our standard of review," *id.*, which is *de novo*, in any case.

11

the state-law battery claim failed for the same reasons as the § 1983 excessive-force claim, and that there was no cause of action for negligent use of force.

The district court also denied as "moot" Plaintiffs' motion to amend to add a negligence claim under state law. The court stated that the motion to amend was untimely, and that, even if it were timely, summary judgment would have been granted on the same ground as on the § 1983 claim. Finally, the court reasoned that, in light of Owens's lengthy law-enforcement career and the lack of any prior allegation of unlawful or excessive force against Owens, there "exists no factual basis on which to conclude that entrustment of a firearm to Owens was a legal, proximate cause of any injury to or the death of Nicholas Thomas."

Plaintiffs now appeal.

## III.

We begin with the district court's decision to grant summary judgment to Owens, which we review *de novo*. *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, we view the record and draw all reasonable inferences in favor of the non-moving party. *Moore v. Pederson*, 806 F.3d 1036, 1041 (11th Cir. 2015). We may affirm the district court on any ground

supported by the record, whether or not the court relied on that ground. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1251–52 (11th Cir. 2013).

Qualified immunity protects government officials from individual liability unless they "violate[] clearly established statutory or constitutional rights of which a reasonable person would have known." *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 951 (11th Cir. 2019) (quotation marks omitted). The aim is to give government officials breathing room "to carry out their discretionary duties without the fear of personal liability or harassing litigation." *Carter v. Butts Cty., Ga.*, 821 F.3d 1310, 1318–19 (11th Cir. 2016) (quotation marks omitted).

Officials invoking qualified immunity must show first that they were acting within the scope of their discretionary authority. *Id.* at 1319. If they were, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. *Id.* To do so, the plaintiff must make two showings: (1) the defendant violated a federal statutory or constitutional right; and (2) the unlawfulness of the defendant's conduct was clearly established at the time of the alleged violation. *Paez v. Mulvey*, 915 F.3d 1276, 1284 (11th Cir. 2019). The requirement that the right be "clearly established" ensures that a reasonable official is on notice "that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quotation marks omitted). "We may consider whether the plaintiff has satisfied his burden in any order." *Carter*, 821 F.3d at 1319.

13

There is no dispute that Owens was acting within the scope of his discretionary authority when he shot and killed Thomas. Accordingly, the burden shifts to Plaintiffs to prove that Owens violated clearly established federal law. After careful review of the evidence and relevant case law, we conclude that Owens did not violate Thomas's constitutional rights, and that, even assuming he did, the unlawfulness of his conduct was not clearly established.

## A.

"Any claim that a law enforcement officer used excessive force—whether deadly or not—during a seizure of a free citizen must be analyzed under the Fourth Amendment's 'reasonableness' standard." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009). This standard requires "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383 (2007) (quotation marks omitted). The government's interests include protecting the safety of the police officers involved and the public at large. *Garczynski*, 573 F.3d at 1166.

The particular facts of each case must be analyzed to determine whether the force used was "objectively reasonable" under the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989); *see Scott*, 550 U.S. at 382–83 (the reasonableness of a "use of a particular type of force in a particular situation" must

be judged by the specific facts and circumstances confronting the officer).  To guide our analysis, we consider three main factors: "(1) the severity of the crime at issue; (2) whether [the suspect] posed an immediate threat to the officers or others; and (3) whether he actively resisted arrest."  *Penley v. Eslinger*, 605 F.3d 843, 850–51 (11th Cir. 2010); *see Graham*, 490 U.S. at 396.  We also consider whether the officers issued a warning before using deadly force.  *Penley*, 605 F.3d at 850. Nevertheless, there are no "rigid preconditions" for the use of force, and courts "must still slosh [their] way through the factbound morass of 'reasonableness.'"  *Scott*, 550 U.S. at 382–83.

We consider Owens's conduct "from the perspective of a reasonable officer on the scene" and without regard to his "underlying intent or motivation."  *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).  In doing so, we must keep in mind that officers face situations that are often "tense, uncertain and rapidly evolving, thereby requiring split-second judgments as to how much force is necessary.  Because an officer's perspective in the field differs from that of a judge sitting peacefully in chambers, we must resist the temptation to judge an officer's actions with the 20/20 vision of hindsight."  *Garczynski*, 573 F.3d at 1167 (quotation marks omitted).

**1.**

15

With regard to the use of deadly force against an individual who was driving a car, our cases "have . . . consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough v. Antolini*, 559 F.3d 1201, 1207 (11th Cir. 2009).

In *Pace v. Capobianco*, for example, we upheld as objectively reasonable an officer's use of deadly force against the driver of a vehicle after a high-speed chase ended with the vehicle having been stopped and surrounded by police officers. 283 F.3d 1275, 1281–82 (11th Cir. 2002). We held that, even accepting that Davis did not try to run over the deputies or aim the car at the deputies, the use of force was justified because the officers had reason to believe that the car "had become a deadly weapon with which Davis was armed" and that the "chase was not over." *Id.* at 1282. We noted that Davis had previously driven recklessly, threatening serious physical harm, that "Davis's car was stopped for, at most, a very few seconds when shots were fired: no cooling time had passed for the officers in hot pursuit," and that Davis had refused to get out of the car. *Id.* at 1281–82.

Similarly, in *Long v. Slaton*, we upheld as objectively reasonable an officer's use of deadly force against a mentally unstable person who had avoided police capture, had stolen a marked police cruiser, and was attempting to drive the police cruiser towards the road. 508 F.3d 576, 578–79 (11th Cir. 2007). We held that the

16

officer's decision to use deadly force was reasonable "in the light of the potential danger posed to officers and to the public if Long was allowed to flee in a stolen police cruiser." *Id.* at 581. We noted that "the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." *Id.* (quotation marks omitted). And we reasoned that, although Long had not yet used the police cruiser as a deadly weapon when the shooting occurred, "Long's unstable frame of mind, energetic evasion of the deputy's physical control, Long's criminal act of stealing a police cruiser, and Long's starting to drive—even after being warned of deadly force—to a public road gave the deputy reason to believe that Long was dangerous." *Id.* at 581–82.

"But where the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's use of deadly force." *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013). In *Vaughan v. Cox*, for example, we held that an officer unreasonably used deadly force against "two suspects who were evading arrest and who had accelerated to eighty to eighty-five miles per hour in a seventy-miles-per-hour zone in an attempt to avoid capture." 343 F.3d at 1330. The police began chasing a truck they suspected was stolen that was traveling on an interstate at or near the speed limit of seventy miles per hour. *Id.* at 1326. Officers positioned their cruisers to the side and in front of the truck and made it clear that they desired the truck to stop. *Id.* Then, the officer in front of the truck applied his breaks,

17

causing the truck to ram into the back of the cruiser. *Id.* After the collision, the truck increased its speed "while staying in the same lane of traffic," ultimately accelerating to eighty to eighty-five miles per hour. *Id.* According to the plaintiff—a passenger in the truck—the driver did not swerve from lane to lane and did not place anyone's safety at risk. *Id.* at 1327 & n.2. An officer fired three rounds into the truck without warning, puncturing the plaintiff's spine and paralyzing him. *Id.* at 1327. The plaintiff sued the officer who shot him. *Id.*

We concluded that a reasonable jury could find that the use of deadly force was unconstitutional because "[g]enuine issues of material fact remain[ed] as to whether [the truck's] flight presented an immediate threat of serious harm . . . at the time [the officer] fired the shot." *Id.* at 1330. We explained that, under the plaintiff's version of the facts, "the truck's lane was clear of traffic," it did not make any "aggressive moves to change lanes," and the collision was "both accidental and insufficient to cause [the officer] to lose control." *Id.* In short, the suspects were merely speeding by ten to fifteen miles per hour in an attempt to avoid capture. *Id.* We also reasoned that a jury could find that deadly force was not necessary to prevent escape—since the truck could easily have been tracked—and that it was feasible for the officer to warn of the potential use of deadly force. *Id.* at 1331.

**2.**

The essential inquiry in this case is whether a reasonable officer in Owens's position could have believed that Thomas posed an immediate threat of serious physical harm to police officers or others at the time of the shooting. *See Vaughan*, 343 F.3d at 1330. "In other words, would [Thomas] have appeared to reasonable police officers to have been gravely dangerous?" *Penley*, 605 F.3d at 854 (quotation marks omitted). Viewing the evidence in favor of the Plaintiffs, we conclude that, despite the tragic outcome in this case, the answer is yes under our precedent.

First, probable cause existed to believe that Thomas had used the Maserati as a deadly weapon by threatening serious physical harm to officers on the scene. *See Pace*, 283 F.3d at 1281. Specifically, the video evidence clearly depicts Thomas in the stopped Maserati, which he did not accelerate until after two officers had already rounded the corner on the west side of the building during the third pass and were directly in the path of the vehicle. At that time, he then quickly accelerated directly towards the officers. The officers were required to step to either side of the quickly approaching car to avoid being hit, and the car passed by very close to one of the officers. Consistent with the video, Cole testified that he believed Thomas had tried to "run [him] over" and that the Maserati missed him by about a foot.

Based on the conduct depicted in the video, the officers had probable cause to believe that Thomas committed aggravated assault. *See Webb v. State*, 569 S.Ed.2d 596, 597 (Ga. Ct. App. 2002) ("[O]ne who aims a motor vehicle at another person

19

may be convicted of aggravated assault regardless of whether the victim sustained any injuries or was even touched by the vehicle."). While Plaintiffs contend that Thomas objectively took steps to avoid the officers—and we agree that Thomas did not swerve at any of the officers or attempt to strike their cruisers—we do not accept Plaintiffs' version of events as to the matters clearly depicted in the video evidence. *See Hinson v. Bias*, 927 F.3d 1103, 1119 (11th Cir. 2019) ("We . . . do not accept Hinson's version of events where the video recordings flatly contradict them."), *petition for cert. filed*, (U.S. Jan. 14, 2019) (No. 19-872). And here, as we have explained, the video plainly depicts Thomas, from a stopped position accelerating directly towards officers in his path.

Although no deadly force was used at that time, it clearly would have been justified. *See Singletary v. Vargas*, 804 F.3d 1174, 1184 (11th Cir. 2015) ("[I]t is well established that an officer may constitutionally use deadly force when his life is threatened by a car that is being used as a deadly weapon."); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (upholding an officer's use of deadly force against a suspect who slowly—at one or two miles per hour—drove a vehicle toward the officer as he stood between the suspect's vehicle and a parked car). Owens's use of deadly force occurred less than one minute later, while Thomas was still dangerously speeding in the Maserati around the Goodyear facility. So this factor supports the reasonableness of Owens's actions.

20

Second, Thomas actively resisted the officers and evaded arrest by refusing to comply with repeated commands at gunpoint to stop and exit the car and by driving the Maserati to avoid multiple officers who were chasing him on foot. So, this factor, too, weighs in favor of Owens. *See Penley*, 605 F.3d at 851 (finding that the decedent's "refus[al] to comply with repeated commands to drop his weapon . . . support[ed] the conclusion that use of deadly force was reasonable").

Third, at the time of the shooting, probable cause existed to believe that Thomas posed an ongoing threat of serious physical harm to officers on the scene. Plaintiffs stress that, under their version of facts, no officer was in the immediate path of the vehicle at the time of the shooting. But "the threat of danger to be assessed is not just the threat to officers at the moment, but also to the officers and other persons if the chase went on." *Long*, 508 F.3d at 581. In *Long*, for example, we upheld the use of deadly force against a fleeing suspect even though the threat posed to the officer "was not immediate in that the cruiser was not moving toward [the officer] when shots were fired." *Id.* at 580–81. Similarly, in *Pace*, we upheld the use of deadly force against the driver of a vehicle that was stopped and surrounded by officers following a high-speed chase, and who did not "try to run over the deputies" or "aim the car at the deputies," because the officers reasonably could have believed that "the chase was not over." *Pace*, 283 F.3d at 1281–82.

21

And here, Thomas had shown no signs of giving up the chase or slowing down. He repeatedly ignored officer commands at gunpoint to stop and exit the car. And he evaded apprehension by accelerating back and forth in the Goodyear parking lot, taking tight corners at speeds—on the final pass, according to Plaintiffs' expert, Thomas averaged 24.79 miles per hour on the backside of the building—that were high enough to pose a threat of serious bodily harm to persons on foot. Meanwhile, at least five officers were in active pursuit of the Maserati on foot, and other employees were on the premises. So, assuming Cole and Owens were outside of immediate danger at the time of the shooting, there were still at least three officers running around on foot. For instance, Graeff testified that, on the fifth pass after the shooting, the Maserati passed in front of him just before he emerged from one of the bay doors on the west wide. Because Thomas had not shown any signs of giving up the chase, the danger posed to the officers, and arguably others on the premises, still existed when Owens fired at Thomas.

While no officer was in the immediate path of the Maserati at the time of the shooting, the danger was sufficiently immediate under our caselaw to make the use of deadly force reasonable under the totality of the circumstances. Under these circumstances, the officers did not have to wait for Thomas to actually hit someone to take action. *See Long*, 508 F.3d at 581 ("[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly

weapon to act to stop the suspect."); *Pace*, 283 F.3d at 1281–82. "Even if in hindsight the facts show that [the officers] perhaps could have escaped unharmed, an objectively reasonable law enforcement officer could well have perceived that the moving vehicle was being used as a deadly weapon, especially after the driver had been repeatedly ordered to stop." *Terrell v. Smith*, 668 F.3d 1244, 1255 (11th Cir. 2012) (citation and quotation marks omitted). Based on the chaotic and quickly unfolding circumstances in the Goodyear parking lot, we cannot say it was unreasonable for Owens to use deadly force.[7]

## B.

Even assuming Thomas's constitutional rights were violated, Owens would be entitled to qualified immunity because the unlawfulness of Owens's conduct was not clearly established at the time of the shooting.

"For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Priester v. City of Riviera Beach*, Fla., 208 F.3d 919, 926

---

[7] Owens did not provide a warning about the possible use of deadly force. But the failure to give a warning does not preclude summary judgment where the facts otherwise indicate that the officer's use of force was reasonable. *See Penley v. Eslinger*, 605 F.3d 843, 854 n.6 (11th Cir. 2010). Plus here, as in *Penley*, the officers had their guns pointed at Thomas when ordering him to comply with their commands, so their failure to explicitly warn Thomas "does not alter our conclusion that the use of lethal force was objectively reasonable." *Id.*

23

(11th Cir. 2000). If there is no precedent that, in factual terms, has staked out a "bright line," the defendant is usually entitled to qualified immunity. *Hoyt v. Cooks*, 672 F.3d 972, 977 (11th Cir. 2012). A right can be clearly established, however, even in the absence of precedent. A plaintiff can point to a "broader, clearly established principle that should control the novel facts in his situation." *Morton*, 707 F.3d at 1282 (cleaned up). Or "a plaintiff may show that an official's conduct was so far beyond the hazy border between excessive and acceptable force that the official had to know he was violating the Constitution even without caselaw on point." *Id.* (cleaned up).

Plaintiffs argue that it is clearly established that police officers may not constitutionally use deadly force against a fleeing, nondangerous suspect, citing *Vaughan*, 343 F.3d 1323, *Ayers v. Harrison*, 650 F. App'x 709 (11th Cir. 2016), *Gaillard v. Commins*, 562 F. App'x 870 (11th Cir. 2014), *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) (*en banc*), and *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015). We find these cases distinguishable, and therefore insufficient to clearly establish the unlawfulness of Owens's conduct.

Plaintiffs chiefly rely on *Vaughan*. In *Vaughan*, we found that the jury could have concluded that the driver of the fleeing vehicle, despite driving above the speed limit and colliding with a police cruiser, "did not use or did not threaten to use his car as a weapon" before the use of deadly force. *Morton*, 707 F.3d at 1283 (quotation

24

marks omitted) (discussing *Vaughan*).  But in this case, the video clearly shows that the Maserati was used to endanger the officers less than a minute before deadly force was used.  In other words, the officers here, unlike the officers in *Vaughan*, had "probable cause to believe that [the driver] had committed a crime involving the infliction or threatened infliction of serious physical harm."  *Vaughan*, 343 F.3d at 1333.  And as *Vaughan* recognized, "the risk presented by [the officer's] allowing [the suspects'] flight to continue is starkly different" where such probable cause exists.  *Id.*  Moreover, Thomas was not simply fleeing but evading officers in such a way that he was repeatedly coming into physical proximity with them.  So *Vaughan* does not clearly establish the unlawfulness of the use of deadly force in this case.

Plaintiffs' reliance on our decisions in *Ayers* and *Gaillard* fails for similar reasons.  To begin with, these cases are unpublished and cannot clearly establish the law in this Circuit.  *See United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013) ("Unpublished opinions are not binding precedent.").  In any case, they are distinguishable because, like *Vaughan*, they involved deadly force being used against a fleeing suspect who posed no threat to a police officer or a third party.  *See Ayers*, 650 F. App'x at 712 (deadly force unreasonable where officers did not have probable cause to believe that the fleeing suspect was armed or dangerous and the suspect had not put an officer in danger during flight); *Gaillard*, 562 F. App'x at 875

25

(deadly force unreasonable where the fleeing suspect was unarmed and on foot). For the reasons we have explained above, this case does not fit that framework.

Finally, the cases of *Gilmere* and *Salvato* do not clearly establish the law here. *Gilmere* held unreasonable the use of deadly force during a physical struggle between officers and a suspect where the officer "had little cause to believe [the suspect] to be dangerous." *Gilmere*, 774 F.2d at 1503. But as we have explained above, officers had reason to believe that Thomas committed an aggravated assault with the Maserati and continued to pose a threat of serious harm.

*Salvato* held unreasonable the use of deadly force against a suspect who was "retreating, apparently unarmed, and outside of striking distance," even though the suspect had struck the officers multiple times before retreating on foot. 790 F.3d at 1294. Citing *Salvato*, we later stated that "[t]he use of deadly force against a suspect who, though initially dangerous, has been disarmed or otherwise become non-dangerous" violates the Fourth Amendment. *Hunter v. City of Leeds*, 941 F.3d 1265, 1281 (11th Cir. 2019). Here, though, Thomas had not been disarmed or otherwise rendered non-dangerous when the shooting occurred. *See Pace*, 283 F.3d at 1282 (use of deadly force objectively reasonable where, even though the decedent's car was stopped at the time of the shooting, officers reasonably believed "that the chase was not over").

In sum, Plaintiffs have not shown that clearly established law put Owens on notice that his conduct was unlawful.  Owens is therefore entitled to qualified immunity even assuming he violated Thomas's constitutional rights.

**IV.**

Plaintiffs seek to hold the City vicariously liable for Owens's alleged battery and negligent shooting.  These claims fail.

As to the alleged battery, Georgia law provides that "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force."  O.C.G.A. § 16-3-21.  "[T]he defendant's actions must be measured against an objective standard of reasonableness."  *Cox v. State*, 453 S.E.2d 471, 473 (Ga. Ct. App. 1995).

Plaintiffs do not contend that they could proceed on a state-law battery claim notwithstanding our conclusion that the shooting in this case was objectively reasonable under the Fourth Amendment.  Rather, they argue that the state-law battery claim and the § 1983 claim are analyzed under the same standard.  *See* Appellant's Br. at 37.  Accordingly, because we have concluded that Owens did not violate the Fourth Amendment in using deadly force against Thomas, it follows that this use of deadly force was justified under Georgia law.

27

As to the Plaintiffs' negligent-shooting theory, they have not shown that Georgia law permits such a cause of action where the shooting was justified. Thus, as with Plaintiffs' battery claim, our conclusion that Owens's use of force was reasonable bars Plaintiffs' recovery.

## V.

Finally, we consider Plaintiffs' claim that the City is liable in negligence for its decision to hire Owens as an officer and to allow him to possess a firearm. This claim was specifically pled under § 1983 in the operative amended complaint. On appeal, however, Plaintiffs expressly abandon their § 1983 claim and seek to proceed solely under state law.

Plaintiffs contend that their amended complaint provided fair notice of such a state-law claim, but we disagree. The only state-law negligence claim raised in the amended complaint was based on Owens's conduct in "using unreasonable force, and in otherwise failing to act as a reasonable and prudent person under the circumstances." In other words, the state-law negligence claim was based solely on a theory of vicarious liability. Plaintiffs' claim based on the City's "fail[ure] to exercise reasonable care in its hiring and retention of Defendant Owens" was specifically pled under § 1983. Moreover, the § 1983 claim was limited to the City's decision to entrust Owens with a firearm when, in Plaintiffs' view, he was prohibited by federal law from possessing one due to a prior domestic-violence conviction. On

28

appeal, Plaintiffs abandon their legal-status argument and instead base their claim more broadly on multiple prior incidents of domestic violence.  Accordingly, we conclude that the state-law negligence claim advanced on appeal was not properly raised in the amended complaint.

Furthermore, we affirm the denial of Plaintiffs' motion to amend to add such a state-law claim.  Even assuming that the district court erred in finding that amendment would be futile, there is no indication the court would grant the motion if we remanded the case.  We know that because the court said it "would not be inclined to grant said motion due to its untimeliness," even if it did not expressly deny the motion as untimely.  Plaintiffs do not dispute that their motion to amend— filed several months after the defendants moved for summary judgment—was untimely, and they have offered no grounds for the delay in seeking amendment. *See Carruthers v. BSA Advert., Inc.*, 357 F.3d 1213, 1218 (11th Cir. 2004) ("It is not an abuse of discretion for a district court to deny a motion for leave to amend following the close of discovery, past the deadline for amendments, and past the deadline for filing dispositive motions." (quotation marks omitted)).

In any case, like the negligence claims against City based on vicarious liability, Plaintiffs have not shown that Georgia law permits a claim for negligent hiring, entrustment, or retention where the harm suffered resulted from objectively reasonable conduct.

29

## VI.

Thomas's death was tragic.  But based on the totality of the circumstances facing Owens in the Goodyear parking lot, we cannot say, for the reasons explained above, that his use of deadly force against Thomas was objectively unreasonable or that the unlawfulness of the conduct was clearly established.  Therefore, Owens is entitled to qualified immunity.  And Plaintiffs claims against the City fail for the reasons explained above.  We therefore affirm the district court's grant of summary judgment.

**AFFIRMED.**