[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 19-13340

_____

SHARON POWELL,
as executrix of the estate of William David Powell,
SHARON POWELL,

Plaintiffs-Appellants,

*versus*

JENNIFER SNOOK,
as Executrix for the Estate of Patrick Snook,

Defendant-Appellee,

ANNIE DAVIS, et al.,

2                    Opinion of the Court                    19-13340

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

D.C. Docket No. 1:17-cv-03412-MHC

_____

Before WILSON, NEWSOM, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

Lawsuits involving claims that officers used deadly force in violation of the Fourth Amendment often involve tragic circumstances. This one does. Just after midnight one evening in June of 2016, Henry County, Georgia, police sergeant Patrick Snook[1] — who was at the wrong house because of imprecise dispatch directions — shot and killed William David Powell, who was innocent of any crime and standing in his driveway. He was holding a pistol because he and his wife thought they had heard a prowler.

_____

[1] While this appeal was pending, Patrick Snook died. His wife Jennifer Snook, as executrix of his estate, was substituted as the defendant-appellee.

Sharon Powell,[2] David's wife, brought a § 1983 claim against Snook in his individual capacity, alleging that he violated her husband's constitutional right to be free from excessive force.  The district court granted Snook's motion for summary judgment on grounds of qualified immunity.  This is Powell's appeal.

The qualified immunity issue before us is the familiar one of whether clearly established law put Snook on notice that firing the shots he did violated David Powell's constitutional rights.  More specifically, was it clearly established that under the circumstances of this case the Constitution required Snook to warn David Powell before shooting him?

## I.  SUMMARY JUDGMENT FACTS

Because this case comes to us after a grant of summary judgment, "the facts at this stage are what a reasonable jury could find from the evidence viewed in the light most favorable to" Powell. *Cantu v. City of Dothan*, 974 F.3d 1217, 1222 (11th Cir. 2020). "[W]hat we state as 'facts' in this opinion for purposes of reviewing the ruling[] on the summary judgment motion may not be the actual facts.  Nonetheless, they are the facts for the present purposes, and we set them out below." *Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997).

---

[2] For clarity and flow purposes, we will sometimes refer to Sharon Powell as "Powell" and refer to William David Powell as "David."

About five minutes before midnight on June 7, 2016, a Henry County 911 operator spoke to a caller who reported hearing a woman's screams and three gunshots. The caller gave her address as 736 Swan Lake Road and said the noises were coming from "a few houses down." She also said that she had called 911 on an earlier occasion "because they were fighting so bad." The operator searched the 911 call history for 736 Swan Lake but did not find a record of that earlier call.

The caller said that her mother had heard the woman scream "help me please" and then nothing else. After that the operator asked the caller for the "nearest intersecting street." She answered "Fairview Road" and added that the screaming and gunshots had come from "the second or third house past [hers] towards Fairview." (In the call report, the operator noted that Fairview was a cross street but did not include what the caller had told her about the screaming and gunshots having come from the direction of that street.)

The operator asked a follow-up question: "[I]f I'm looking at your house where exactly would their house be?" Once again, the caller said it was a "couple houses down on the right towards Fairview Road." But the operator wrote in her report only that, if a person were looking at the caller's house, the noises had come from two or possibly three houses "down to the right." She omitted the caller's more helpful and less vague direction about the noises being toward Fairview. That is where the seeds of tragedy were sown.

Based on the operator's report, a 911 dispatcher sent police officers to 736 Swan Lake, explaining that if they were "looking at this location, it's two houses down on the right, maybe three houses." Officer Snook, who was in charge of the uniform patrol division that shift, responded to the call with Officers Matthew Davis and Ashley Ramsey. On the way to Swan Lake, Snook asked dispatch if it could find the address for the place where the disturbance had actually occurred. A 911 call center supervisor, who had replaced the earlier dispatcher during midnight shift-change, replied that dispatch thought it was "either 690 or 634." The Powells lived at 690 Swan Lake.

The three officers, who all wore police uniforms, parked their cars along the roadway with their blue lights off. Before approaching the Powells' house, Officer Davis asked the supervisor why dispatch believed 690 was the correct location and asked him to get more information from the caller. When the supervisor dialed the number that had originally called 911, the original caller's mother answered and agreed with the supervisor that the sounds had come from "the right, south of [the caller's location] going towards Gardner [Road]." From the perspective of a person standing on Swan Lake Road and looking at house 736, the Powells' house is to the right and toward Gardner Road.

Based on the 911 dispatch information, the officers approached the Powells' house, which could not be seen from the road because of its long driveway. As the officers walked down that long driveway, there were no lights on inside or outside the

house. It was very dark. Because they were going to a call involving domestic violence with shots fired, the officers approached cautiously, trying to avoid being targets for a shooter. Snook carried a rifle because of the dangerous circumstances and in case long-range fire was necessary.

There were two trucks at the house, which the supervisor told Snook were registered to the Powells, a couple in their sixties. The supervisor also told Snook that previous 911 calls for the Powells' house had involved an alarm and an ambulance. Snook knew from his experience that alarm or ambulance calls sometimes grew out of domestic violence incidents, but he also knew, because the supervisor had told him, that police had not been dispatched to the Powells' house before for a domestic violence incident.

Snook sent Ramsey to cover the back of the house while he and Davis stayed out front. Snook was close to the driveway area. He took his flashlight to look in the windows, but he didn't see any damage or lights on inside the house and didn't hear any screaming. Sharon Powell, who was inside, didn't hear any knocks on her door or rings of her doorbell, but she did hear her dogs barking, which had awakened her and David.

The two of them got out of bed but did not check their front door. Instead, David went to the laundry room door, looked out the window, and told Sharon that he saw someone outside. He went to his closet, put on his pants, and got his pistol. He then walked through a kitchen door into an attached garage and pushed

19-13340                Opinion of the Court                7

a button that caused the garage door to begin opening and the garage light to come on. All the other house lights were still off.

It takes the garage door 8.8 seconds to open. When the door had fully opened, David walked out onto the driveway holding the loaded pistol in his right hand. After walking 10 to 15 steps at a normal pace, which took about nine seconds,[3] he stopped and turned to face the walkway leading up to his front door, which is where Officer Snook was positioned in the dark. When David Powell stopped walking, he was standing straight up and his arms were pointed straight down with the pistol in his right hand.

Sharon Powell had followed David onto the driveway and stood four or five feet behind him. She was facing his right side, focused on him, watching him. She heard no noise or voice, either while the garage door was opening or after she and her husband

---

[3] Sharon Powell has described on two occasions how long David's walk from the garage took. She testified in her deposition that it took "only a few seconds," a "short time." She later swore in her declaration that she had "retraced" David's steps "using the same pace" and that covering the distance he walked took her "approximately nine seconds." The district court used Powell's deposition testimony. But because we must view the evidence in the light most favorable to Powell, *Cantu*, 974 F.3d at 1222, and because the more specific time estimate in her declaration doesn't outright contradict the more general one in her deposition, we use the nine seconds number from her declaration. *See Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986) ("[W]e may only disregard an affidavit that contradicts, without explanation, previously given clear testimony.") (quotation marks omitted).

8                    Opinion of the Court                    19-13340

went outside.  She specifically did not hear anyone identify themselves as police officers.  It was perfectly quiet.

Sharon Powell had a sense that David was looking at someone.  He started to raise his right arm — the one holding the pistol — and got the pistol hip-high. While David was doing that, Snook went down to one knee to make himself a smaller target and rapidly fired three shots with his rifle.  Sharon testified that only a "very short time" — "[l]ike one second it felt like" — passed between when David started to raise his gun and when Snook began firing.[4]

After Snook fired, David dropped to the ground.  Sharon screamed, ran into the house, locked the door, and called 911.  The officers on the scene aided David and called for an ambulance that took him to the hospital, but he died the next day.

---

[4] Sharon Powell's deposition testimony was unequivocal about how closely connected the shots were to her husband's act of raising his pistol:

> Q. All right.  So from the point where Mr. Powell stopped, took the position and started raising the gun, how far between that point and the shots fired? Or how long did it take?
>
> A. Like one second it felt like.
>
> Q. Very, very short time?
>
> A. Very short time

Doc. 62 at 88; *see also id.* at 89 (Sharon confirming that when David "started raising the gun, quickly shots were fired, and then Mr. Powell fell.").

## II.   PROCEDURAL HISTORY

On her own behalf and as executrix of her husband's estate, Sharon Powell filed a 42 U.S.C. § 1983 complaint in the Northern District of Georgia explicitly claiming that Snook violated David Powell's Fourth and Fourteenth Amendment rights and less explicitly claiming that Snook committed the tort of negligence in the process.[5]   The parties eventually stipulated to the dismissal of all claims against Snook except for the Fourth Amendment excessive force claim, and Snook filed a motion for summary judgment contending that he was entitled to qualified immunity on that claim.

Powell opposed that motion, contending that Snook was not entitled to qualified immunity because precedent, specifically *Tennessee v. Garner*, 471 U.S. 1 (1985), and our case law applying it, clearly established that he could not constitutionally use deadly force against David Powell without first identifying himself as a police officer and issuing a warning.  Powell argued Snook could have "easily" given that warning because David was not an immediate threat, refusing any officer's command, or attempting to escape.  She asserted that our case law recognized that the "mere presence" of a firearm isn't enough to warrant the use of deadly force and that

---

[5] Powell's complaint also included claims against Officer Davis, Officer Ramsey, the 911 operator, the 911 supervisor, the director of the Henry County 911 service, and Henry County itself.  After those defendants filed motions for summary judgment, the parties stipulated to the dismissal of all Powell's claims against them, which mooted their summary judgment motions.

the reasonableness of any force depends on whether a suspect poses a threat of serious physical harm, with an emphasis on the level and immediacy of the threat. She also asserted that since *Garner* the law has been "abundantly clear that officers should issue a warning unless it is not feasible to do so before using deadly force" and argued that Snook had "ample opportunity (at least 17.8 seconds) to identify himself and give a proper warning before deadly force was used."

The district court granted summary judgment to Snook, holding that he was entitled to qualified immunity. The court distinguished the decisions Powell claimed clearly established a violation of the Fourth Amendment, noting that none of them involved someone who, like David Powell, "was holding a gun and raising his arm at the time of the shooting." The court explained what the Supreme Court held in *Garner* was that it was unreasonable to kill a "young, slight, and unarmed" burglary suspect by shooting him in the back of the head while he was running away. *See* 471 U.S. at 21. The officer in *Garner* "could not reasonably have believed" the suspect "posed any threat" and had justified his actions only by saying that he needed to prevent an escape. *Id.* In contrast, the district court noted, Snook fired the fatal shots while David "was facing Snook and in the process of raising a handgun" and "justified his actions on the basis of his belief that [David] was about to shoot him."

The district court also distinguished *Lundgren v. McDaniel*, 814 F.2d 600 (11th Cir. 1987), where officers did not have any

advance report that a burglary suspect was armed and they were not apparently, much less actually, threatened with a weapon. *Id.* at 602–03. Without provocation, those officers shot a non-dangerous suspect. *Id.* The district court reasoned that what the *Lundgren* officers encountered was different from what happened here, where officers responded at night to a shots-fired domestic violence call and were confronted with an armed man facing them and raising a pistol. And, the court explained, this case is materially different from *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016), where an officer shot a man who was subdued, unarmed, and not resisting arrest. *Id.* at 1222.

After concluding there was no relevant decisional law clearly establishing that Snook violated David Powell's Fourth Amendment right to be free from excessive force, the district court considered whether Snook's conduct "was so obviously at the very core of what the Fourth Amendment prohibits that any officer would know the conduct was illegal." In concluding that it was not, the court reasoned that the "decisive factor" was that David Powell "carried a gun in his right hand and began raising that gun in front of a police officer" and while facing "in the direction of the officer." The court granted summary judgment on qualified immunity grounds because it was not clearly established that the use of deadly force in these specific circumstances violated the Fourth Amendment.

### III.  ANALYSIS

We review *de novo* a grant of summary judgment based on qualified immunity, construing the facts and drawing all inferences in the light most favorable to the nonmoving party.  *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013).

The qualified immunity doctrine protects an officer unless at the time of the officer's supposedly wrongful act the law "was already established to such a high degree that every objectively reasonable" officer in his place "would be on notice" that what he was doing was "clearly unlawful given the circumstances."  *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002).  The doctrine protects "all but the plainly incompetent or one who is knowingly violating the federal law."  *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012) (quotation marks omitted).  For qualified immunity to apply, an officer "must first establish that he acted within his discretionary authority."  *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013).  Once the officer does that, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Penley v. Eslinger*, 605 F.3d 843, 849 (11th Cir. 2010).

To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so.  *See, e.g., Terrell*, 668 F.3d at 1250.  Plaintiffs can meet the clearly established requirement in one of three ways:  (1) by pointing to a materially similar decision

of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose; (2) by establishing that "a broader, clearly established principle should control the novel facts" of the case; or (3) by convincing us that the case is one of those rare ones that "fits within the exception of conduct which so obviously violates th[e] constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005).

Under the first and second of these methods, the plaintiff must rely on decisional law. *See Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002) (noting that in the first method we "look at precedent that is tied to the facts" while in the second method we look for "broad statements of principle in case law [that] are not tied to particularized facts") (emphasis omitted).  Under the second and third methods, we look for "obvious clarity": a principle or provision so clear that, even without specific guidance from a decision involving materially similar facts, the unlawfulness of the officer's conduct is apparent. *Id.* at 1350–51 (noting that "broad statements of principle in case law . . . can clearly establish law applicable in the future to different sets of detailed facts" and that the "words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances"); *see also Corbitt v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019); *Fish v. Brown*, 838 F.3d 1153, 1163 (11th Cir. 2016).  In all three methods, the "'salient question' is whether the state of the law at the time of the incident gave [the officer] 'fair warning' that his conduct was unlawful."

*Perez*, 809 F.3d at 1222 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

We have recognized that obvious clarity "is a narrow exception to the normal rule that only case law and specific factual scenarios can clearly establish a violation." *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011) (quotation marks omitted). "Concrete facts are generally necessary to provide an officer with notice of the hazy border between excessive and acceptable force." *Id.* (quotation marks omitted). If "case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Corbitt*, 929 F.3d at 1312 (quotation marks omitted).

Powell does not dispute that Snook was acting within his discretionary authority, so she bears the burden of showing that qualified immunity is not otherwise appropriate here. Like she did in the district court, Powell contends that her husband had a constitutional right to a warning before Snook used deadly force against him. And like she did in the district court, she argues that *Garner* and our case law applying it had clearly established before the encounter that night in her driveway the right to a warning that she asserts on David's behalf. But unlike she did in the district court, where she mentioned the phrase but did not argue it, Powell now also explicitly asserts that this case is one of the few to fit within the narrow obvious clarity exception to our normal rule requiring a fact-specific bright line.

A.  *Materially Similar Case*

For all of her arguments Powell relies on case law, specifically *Garner*, *Lundgren*, *Perez*, and *White v. Pauly*, 137 S. Ct. 548 (2017).[6] In considering those decisions, we keep in mind the general analytical framework for an excessive force claim. "We analyze a claim of excessive force under the Fourth Amendment's objective reasonableness standard." *Shaw v. City of Selma*, 884 F.3d 1093, 1099 (11th Cir. 2018) (quotation marks omitted). We view the facts "from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts," and we "balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).

"In cases involving excessive force claims it is doctrinal gospel that we do not view an officer's actions with the 20/20 vision of hindsight and that we make special allowance for them in tense, uncertain, and rapidly evolving situations." *Shaw*, 884 F.3d at 1100 (citations and quotation marks omitted); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (noting that the "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

---

[6] Powell also cites *Young v. Borders*, 850 F.3d 1274, 1283 (11th Cir. 2017), but that opinion is only a concurrence in the denial of a petition for rehearing en banc, which has no precedential value.

of force that is necessary in a particular situation") (quotation marks omitted).

The "law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Instead, an officer may use deadly force when he:

> (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" *or* "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible.

*Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (first emphasis added) (quoting *Garner*, 471 U.S. at 11–12). When considering the threat of physical harm to the officer or others, we emphasize "the level and immediacy of that threat." *Perez*, 809 F.3d at 1220.

We generally use the *Garner* factors to assess the reasonableness of deadly force, *see Terrell*, 668 F.3d at 1251, but "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott v. Harris*, 550 U.S. 372, 382 (2007). "The constitutional test for excessive force is necessarily fact specific," *McCullough*, 559

F.3d at 1206,  so "in the end we must still slosh our way through the factbound morass of 'reasonableness,'" *Scott*, 550 U.S. at 383.

While the "mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit," *Perez*, 809 F.3d at 1220, when a suspect's gun is "available for ready use" — even when the suspect has not "drawn his gun" — an officer is "not required to wait and hope for the best," *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (cleaned up).  Our *Shaw* decision drives that point home.  In that case an officer used deadly force against a mentally unstable man who had a hatchet in his hand and was advancing on the officer.  884 F.3d at 1096–97.  The man had not raised the hatchet, but we affirmed the grant of summary judgment for the officer on qualified immunity grounds anyway.  *Id.* at 1100–01.  We did so because: "A reasonable officer could have also concluded, as [the officer] apparently did, that the law did not require him to wait until the hatchet was being swung toward him before firing in self-defense." *Id.* at 1100; *see also Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015).

On the subject of warnings, we "have declined to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing — particularly where such a warning might easily have cost the officer his life." *Penley*, 605 F.3d at 854 n.6 (cleaned up); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1269 n.19 (11th Cir. 2003).  And the Supreme Court has instructed us that a plaintiff "cannot establish a Fourth Amendment violation

based merely on bad tactics that result in a deadly confrontation that could have been avoided." *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) (quotation marks omitted).

Sharon Powell frames her appeal in a way that asks us to focus on the third *Garner* factor, the feasibility of a pre-deadly force warning. Or as she'd call it, the right to such a warning. But we have never held that an officer must always warn a suspect before firing. As we have just noted, we have rejected exactly that kind of "inflexible rule." *See Penley*, 605 F.3d at 854 n.6. And rightfully so. Plaintiffs frequently cite *Garner* for the broad principle that a warning is always required before deadly force may be used, but *Garner* does not mandate that. *Garner* does not say "always." *Garner* says "where feasible." 471 U.S. at 11–12. Not only that, but *Garner* involved a fleeing non-dangerous suspect in a non-violent crime, *see id.* at 4–5; it did not involve an armed man facing an officer and raising a pistol, a circumstance that put would put any reasonable officer in fear for his life.

From Officer Snook's perspective, the relevant one for assessing the reasonableness of the force, *see McCullough*, 559 F.3d at 1206, he and his fellow officers had responded to a 911 report of domestic violence involving multiple gunshots and expected to find a suspect who had been violent before. A man came out into the driveway after midnight holding a pistol in his right hand. After nine seconds of walking, during which he carried the pistol but kept it pointed at the ground, the man stopped and faced the walkway leading up to his front door, where Snook was positioned in the

dark. While facing Snook, the man started to raise the pistol. Only a very short time, about one second, passed between the man starting to raise his pistol and Snook firing.

Powell contends that a warning was required before Snook fired, either in the seconds her husband was walking out onto the driveway or in the single second between when her husband began to raise his pistol and when Snook fired. But three of the decisions on which Powell relies for that conclusion contain the most critical factual difference: none of them involved an officer faced with an armed suspect who was raising his firearm in the officer's direction. *See Garner*, 471 U.S. at 4, 21; *Perez*, 809 F.3d at 1217–22; *Lundgren*, 814 F.2d at 602–03 & n.1.

Powell's final decision is similarly unhelpful. In *White*, a decision in which the Supreme Court unanimously held that the officer was *entitled to* qualified immunity, "an officer who—having arrived late at an ongoing police action and having witnessed shots being fired by one of several individuals in a house surrounded by other officers—sho[t] and kill[ed] an armed occupant of the house without first giving a warning." 137 S. Ct. at 549. The Court concluded that those facts were "not a case where it is obvious that there was a violation of clearly established law under *Garner*." *Id.* at 552. *White*'s holding that there was no violation of clearly established law under those facts cannot clearly establish that there was a constitutional violation here, a later case involving materially different facts.

### B.  *Obvious Clarity*

Nor has Powell shown that precedent establishes "with obvious clarity" untethered to particularized facts that Snook was required to warn David before using deadly force.  *Vinyard*, 311 F.3d at 1350–51.  We have repeatedly affirmed grants of qualified immunity to officers who used deadly force against armed suspects without giving a warning when a reasonable officer would have believed the threat of harm was imminent.  *See, e.g.*, *Jean-Baptiste*, 627 F.3d at 819–21 (officer "fired his pistol without warning"); *Penley*, 605 F.3d at 854 n.6 (officers had ordered the suspect to drop his weapon but had not explicitly warned they would shoot if he didn't); *Jackson v. Sauls*, 206 F.3d 1156, 1162–63, 1172–74 (11th Cir. 2000) (officers fired without identifying themselves or giving warning).

While it's clear that in some circumstances an officer must warn before using deadly force where it's *feasible* to do so, *Garner*, 471 U.S. at 11–12, decisions addressing how soon an officer is required to give a warning to an *unarmed* suspect do not clearly establish anything about whether or when a warning is required for *armed* suspects raising a firearm in the direction of an officer.  *See Garner*, 471 U.S. at 4, 21 (unarmed teen burglary suspect); *Perez*, 809 F.3d at 1217 (unarmed man lying on his stomach); *Lundgren*, 814 F.2d at 603 n.1 (store owner who did not threaten the officer with a weapon).  There is no obviously clear, any-reasonable-officer-would-know rule that when faced with the threat of deadly force, an officer must give an armed suspect a warning at the

earliest possible moment. *See White*, 137 S. Ct. at 552 (concluding, where late-arriving officer shot armed suspect without giving a warning, it was not an obvious case under *Garner*'s general principles). Instead, what's clearly established is that it "is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Tillis v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021) (quotation marks omitted).

When David Powell started to raise his pistol while facing in Officer Snook's direction, Snook had the authority to use deadly force. *See id.*; *Jean-Baptiste*, 627 F.3d at 821. It would not be clear and obvious to any reasonable officer that a warning was required in the 17.8 seconds between when David Powell pushed his garage door button and raised his loaded pistol in Snook's direction. A reasonable officer could have decided, as Snook did, that the safest thing to do as David came out of his garage with a pistol at his side was to wait and see what he did with the pistol before Snook drew attention to himself and potentially escalated the situation by shouting a warning. *See Penley*, 605 F.3d at 854 n.6 (noting that a warning in some situations may "cost the officer his life") (quotation marks omitted).

In hindsight, that decision may have been a mistake. But, of course, we "do not view an officer's actions with the 20/20 vision of hindsight." *Shaw*, 884 F.3d at 1100 (quotation marks omitted). Qualified immunity leaves "room for mistaken judgments." *Coffin*

*v. Brandau*, 642 F.3d 999, 1017 (11th Cir. 2011) (en banc) (quotation marks omitted).

Whether analyzed under the specific facts of prior decisions or under the narrow obvious clarity exception, "[i]nstead of clearly establishing the law against [Snook], binding precedent clearly establishes it in his favor." *Shaw*, 884 F.3d at 1100. An officer in Snook's position during the rapidly unfolding events on that dark night reasonably could have believed that the man raising a pistol in his direction was about to shoot him, and our precedent establishes he could "respond with deadly force to protect himself." *Hunter*, 941 F.3d at 1279. Snook didn't have to wait until David Powell fired his gun to return fire in self-defense. *See Long*, 508 F.3d at 581. Warnings are not always required before the use of deadly force. *See Penley*, 605 F.3d at 854 n.6; *Carr*, 338 F.3d at 1269 n.19. And as we've explained, giving a warning in the seconds before David raised his gun wasn't a clearly established requirement, *see Shaw*, 884 F.3d at 1100 (noting the "special allowance" for officers in uncertain situations), and giving a warning in the one second between David raising his gun and Snook firing wasn't feasible.

## IV. CONCLUSION

Because Sharon Powell has not identified case law with materially similar facts or with a broad statement of principle giving Snook fair notice that he had to warn David Powell at the earliest possible moment and before using deadly force, she has not met her burden of showing qualified immunity is not appropriate. *Penley*, 605 F.3d at 849; *Mercado*, 407 F.3d at 1159; *Vinyard*, 311 F.3d

at 1350–52.  She has not shown that Snook's actions were unreasonable for qualified immunity purposes.  As we have said before, "[t]he shooting . . . was tragic, as such shootings always are, but tragedy does not equate with unreasonableness" under clearly established law.  *Shaw*, 884 F.3d at 1101.

**AFFIRMED.**