[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14646

_____

ALICIA TORRES,
Surviving Heir and Parent of deceased
Peter Torres,
ALFONSO TORRES,
Surviving Heir and Parent of deceased
Peter Torres,

                                    Plaintiffs-Appellants,

*versus*

SHERIFF ROD HOWELL,
Individually and in his official capacity as
Sheriff of Colquitt County,
JOSHUA LUKE,
Individually and in his official capacity as

2                  Opinion of the Court                  20-14646

an employee of the Colquitt County Sheriff's Office,

                                                    Defendants-Appellees,

COLQUITT COUNTY SHERIFF'S OFFICE, et al.,

                                                    Defendants.

_____

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:19-cv-00033-WLS

_____

Before ROSENBAUM, TJOFLAT, Circuit Judges, and STEELE, [*] District
Judge.

PER CURIAM:

        Plaintiffs-Appellants Alicia and Alfonso Torres appeal from
the portion of the district court's order granting summary judg-
ment in favor of Defendant-Appellee Deputy Joshua Luke on their
claim of excessive force resulting from the shooting death of their
20-year-old son Peter Torres.  We have carefully reviewed the

_____

[*] The Honorable John E. Steele, United States District Judge for the Middle
District of Florida, sitting by designation.

record, including the recording of the incident, and have had the benefit of oral arguments. Though this is a tragic case, for the reasons discussed below, we must affirm the district court's judgment.

## I.

"We review *de novo* a grant of summary judgment based on qualified immunity, construing the facts and drawing all inferences in the light most favorable to the nonmoving party." Powell v. Snook, 25 F.4th 912, 920 (11th Cir. 2022) (citing Feliciano v. City of Miami Beach, 707 F.3d 1244, 1247 (11th Cir. 2013)). The facts of this case are largely established by recorded conversations with a Sheriff's Office dispatcher and the audio and video recording from a body camera worn by the deputy. We review *de novo* the videotape evidence that was presented to the district court at the summary judgment stage. Scott v. Harris, 550 U.S. 372, 380-81 (2007). Where the video does not answer all the questions or resolve all the details of the encounter, we view the evidence in the light most favorable to Appellants as the non-moving party. Johnson v. City of Miami Beach, 18 F.4th 1267, 1269 (11th Cir. 2021).

## II.

Plaintiffs-Appellants Alicia and Alfonso Torres resided in Moultrie, Georgia, with their three children, including decedent Peter Torres (Torres). On February 4, 2017, their daughter called 911 to report that her brother Peter was belligerent and began to batter and assault those around him. Deputy Joshua Luke (Deputy Luke) and Deputy Joshua Perry (Deputy Perry) (collectively, the "Deputies"), two uniformed officers of the Colquitt County Sheriff's Office, were dispatched to the residence.

The 911 dispatcher notified the deputies that a domestic dispute occurred and Torres was "going to be physical with everyone in the house," he may have a weapon (possibly a knife), and he was possibly under the influence of narcotics. Minutes later, the dispatcher reported that Torres was chasing after the occupants of the residence and that the occupants had left the home. As the Deputies drove to the residence, another deputy reported over the radio that he had responded to the same residence about a week prior regarding a physical domestic dispute. Before the Deputies arrived at the residence, the dispatcher advised that Torres was no longer chasing the family members, did not have any weapons, and had "trashed the house."

Deputies Luke and Perry arrived at the Torres residence in separate marked patrol vehicles. At that point, everyone except Torres had fled the home. Deputy Luke then walked to the rear of the house, while Deputy Perry walked to the front door. Deputy Luke was equipped with a body camera, which recorded the events that followed.

Upon entering the backyard, Deputy Luke saw Torres sitting in a chair with his head slumped down. Deputy Luke spoke to Torres, saying "Boss man, do not move." Getting no reaction, Deputy Luke repeated this instruction, twice exclaiming, "Don't move." Instead of complying, Torres raised his head, leaned forward, grabbed a metal tray, and threw it at Deputy Luke. In response, Deputy Luke drew his handgun and twice stated to Torres "Let me see your hands." Torres was approximately 20 feet away at the time and did not comply with Deputy Luke's instructions.

Torres then stood up, and Deputy Luke instructed Torres to "quit moving." Torres picked up a small propane tank that was on the ground and began to run towards Deputy Luke. Deputy Luke sidestepped away from Torres and began running towards his patrol car, intending to use it as a barrier between himself and Torres. The video shows that sixteen seconds elapsed between the time Deputy Luke first made visual contact with Torres and the time that Torres began charging Deputy Luke.

As he was retreating, Deputy Luke attempted to contact Deputy Perry via radio, and he looked in Torres's direction. Deputy Luke saw that Torres was still running towards him. Torres was running with his hands by his side, so Deputy Luke could not determine whether Torres had a weapon in either one of his hands. The video shows though, by that time, Torres had dropped the propane tank. Deputy Luke instructed Torres to "quit," but Torres did not slow his speed, change direction, or give any indication that he intended to stop pursuing Deputy Luke. When Torres got within two to three feet of him, Deputy Luke turned and fired his handgun once, striking Torres in the chest. The shot proved to be fatal. The video establishes that three seconds elapsed between the time Deputy Luke began retreating to his patrol vehicle and the time he fired his handgun.

## II.

The only issues before us relate to the district court's grant of Deputy Luke's motion for summary judgment on the federal excessive force claim under 42 U.S.C. § 1983 based upon qualified

immunity.  As relevant to this appeal, the district court found that Deputy Luke's actions were objectively reasonable under the circumstances and therefore did not constitute the excessive use of force in violation of the Fourth Amendment.  The district court also found that qualified immunity applied to the facts of the case. Appellants argue that the district court erred because there were genuine issues of material fact as to whether Deputy Luke used excessive force, whether a constitutional violation had occurred, and whether Deputy Luke was entitled to qualified immunity.

Both Fourth Amendment principles and qualified immunity principles are well-established.  As the Supreme Court has summarized:

> Our case law sets forth a settled and exclusive framework for analyzing whether the force used in making a seizure complies with the Fourth Amendment. See Graham [v. Connor,] 490 U.S. [386, 395], 109 S. Ct. 1865 [(1989)].  As in other areas of our Fourth Amendment jurisprudence, "[d]etermining whether the force used to effect a particular seizure is 'reasonable'" requires balancing of the individual's Fourth Amendment interests against the relevant government interests.  Id., at 396, 109 S. Ct. 1865.  The operative question in excessive force cases is "whether the totality of the circumstances justifie[s] a particular sort of search or seizure." [Tenn. v.] Garner, [471 U.S. 1,] 8–9, 105 S. Ct. 1694.
>
> The reasonableness of the use of force is evaluated under an "objective" inquiry that pays "careful

attention to the facts and circumstances of each particular case." Graham, supra, at 396, 109 S. Ct. 1865. And "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Ibid. "Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." Saucier v. Katz, 533 U.S. 194, 207, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim.

Cnty. of Los Angeles, Cal. v. Mendez, 137 S. Ct. 1539, 1546–47 (2017). "Whether an officer has used excessive force depends on 'the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" Rivas-Villegas v. Cortesluna, 142 S. Ct. 4, 8 (2021) (quoting Graham, 490 U.S. at 396).

> As we have recently stated as to qualified immunity:
>
> The qualified immunity doctrine protects an officer unless at the time of the officer's supposedly wrongful act the law "was already established to such a high degree that every objectively reasonable" officer in his place "would be on notice" that what he was doing was "clearly unlawful given the circumstances." Pace

> v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002).
> The doctrine protects "all but the plainly incompe-
> tent or one who is knowingly violating the federal
> law." Terrell v. Smith, 668 F.3d 1244, 1250 (11th Cir.
> 2012) (quotation marks omitted).  For qualified im-
> munity to apply, an officer "must first establish that
> he acted within his discretionary authority." Morton
> v. Kirkwood, 707 F.3d 1276, 1280 (11th Cir. 2013).
> Once the officer does that, "the burden shifts to the
> plaintiff to show that qualified immunity is not appro-
> priate." Penley v. Eslinger, 605 F.3d 843, 849 (11th
> Cir. 2010).

Powell, 25 F.4th at 920.

The parties agree that Deputy Luke was acting within his discretionary authority at all relevant times.  Therefore, the burden shifted to Appellants.  See Penley, 605 F.3d at 849.  "To overcome a qualified immunity defense where the defendant acted within his discretionary authority, the plaintiff must show that the defendant's actions not only violated one or more constitutional rights, but also that it was clearly established at the time that those specific actions did so." Powell, 25 F.4th at 920.

Drawing all reasonable inferences in favor of Plaintiffs-Appellants, we conclude that the district court properly found there are no disputed material facts and that consideration of all the relevant circumstances demonstrates that Deputy Luke's level of force was not constitutionally unreasonable.

A family member had called 911 to report that Torres had committed assault and battery against the occupants of his

residence.  As the Plaintiffs-Appellants concede, Deputy Luke was told that "Peter Torres was terrorizing people in the house" and was "physical with everyone."  Deputy Luke was first told by the dispatcher that Torres may have a knife, then that Torres did not have any weapons.  Deputy Luke stated, however, that he knew that the dispatcher had no way of knowing whether Torres had a weapon at the time Deputy Luke encountered him.  This is particularly true since Torres had unfettered access to the house and its contents after his family fled the home and before the Deputies arrived.

Importantly, during a rapidly evolving, nineteen-second encounter, Torres threw a tray in defiance of Deputy Luke's command not to move, ignored repeated commands to show his hands and stop moving, and despite Deputy Luke pointing his firearm, Torres stood up and aggressively charged Deputy Luke.  Even as Deputy Luke attempted to retreat behind his patrol car, Torres continued to pursue Deputy Luke, coming within an arm's reach of Deputy Luke and his drawn weapon.

Even if Deputy Luke had known for sure Torres did not have a knife or any other weapon, it is undisputed that Torres ignored repeated commands, charged Deputy Luke, and got close enough that he would have been able to obtain the deputy's firearm and use it against the Deputies.  Torres's possible intoxication and Deputy Luke's larger physical stature do not diminish the severity of Torres's threatening conduct or the reasonableness of the Deputy's response.  Considering the unpredictability of Torres's behavior and his aggressive movement towards Deputy Luke,

"[w]e think that [Deputy Luke] need not have taken that chance and hoped for the best." Long v. Slaton, 508 F.3d 576, 583 (11th Cir. 2007). Torres's conduct established the danger of imminent bodily injury if he had reached Deputy Luke.

Even supposing the district court was incorrect in finding no Fourth Amendment violation, the record establishes that Deputy Luke did not violate any clearly established law, and therefore is entitled to qualified immunity. As City of Tahlequah, Okla. v. Bond, 142 S. Ct. 9, 11 (2021) stated: "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (quoting D.C. v. Wesby, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted)). "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." White v. Pauly, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks omitted). Although "this Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." White, 37 S. Ct. at 551 (alterations and internal quotation marks omitted). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."

Brosseau v. Haugen, 543 U.S. 194, 198 (2004) (per curiam) (internal quotation marks omitted). See also Rivas-Villegas, 142 S. Ct. at 7-8.

Appellants have not identified any Supreme Court or Eleventh Circuit precedent finding a Fourth Amendment violation under similar circumstances. Indeed, the case law supports the use of deadly force in comparable circumstances. See, e.g., Hammett v. Paulding Cnty., 875 F.3d 1036, 1051 (11th Cir. 2017) (finding the use of deadly force was reasonable when Hammett disobeyed an officer's instruction to show his hands and moved aggressively towards the officer, despite finding out after the fact that Hammett did not have a deadly weapon); Jean-Baptiste v. Gutierrez, 627 F.3d 816, 821 (11th Cir. 2010) (deadly force was reasonable when the officer was "suddenly confronted" by the suspect and "forced to decide in a matter of seconds whether to deploy deadly force"); McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1246 (11th Cir. 2003) (per curiam) (concluding an officer's use of deadly force was objectively reasonable where the suspect posed an imminent threat of violence to the officer because he ignored the officer's repeated commands and charged an armed officer with a stick); see also DeLuna v. City of Rockford, 447 F.3d 1008, 1013 (7th Cir. 2006) (an officer "need not wait until there is a physical struggle for control of his weapon before a situation presents an imminent danger of serious physical injury.").

While Torres's death is awful, for the foregoing reasons, the judgment of the district court is affirmed.

**AFFIRMED.**